## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **MICHAEL BAZZREA, SABRINA WILDER, COURTNEY CHEATUM, TIMOTHY JORDEN, CALEB WADSWORTH,** | § § § § § | |
| **for themselves and all others similarly situated,** | § § § | |
| **Plaintiffs** | § | |
| **v.** | § § | **Civil Action No. _____** |
| **ALEJANDRO MAYORKAS, in his official capacity as Secretary of the U.S. DEPARTMENT OF HOMELAND SECURITY,** | § § § § § § | **CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **LINDA L. FAGAN, in her official capacity as Commandant of the UNITED STATES COAST GUARD,** | § § § § § § | **JURY TRIAL DEMAND** |
| **LLOYD AUSTIN, in his official capacity as Secretary of the U.S. DEPARTMENT OF DEFENSE,** | § § § § § | |
| **JANET WOODCOCK, in her official capacity as Acting Commissioner of the U.S. FOOD AND DRUG ADMINISTRATION** | § § § § § § | |
| **Defendants.** | § § | |

## INTRODUCTION

1.     Plaintiffs are members of the United States Coast Guard ("USCG"), active-duty and Reserve, all subject to the Department of

Defense ("DoD") COVID-19 "vaccine" mandate issued by Defendant Secretary of Defense Lloyd Austin, III on August 24, 2021, as executed by the Secretary of the Department of Homeland Security and Commandant of the Coast Guard. Consistent with the Secretary of Defense's direction, on August 26, 2021, the Commandant announced that all Coast Guard active duty and Ready Reserve members who are not fully vaccinated, and do not fall within an approved exception, must be vaccinated against COVID-19.[1]

2.    Defendants have mandated that all members of the Coast Guard receive a COVID-19 vaccine or be involuntarily separated. In theory, Defendants offer medical, administrative, and Religious Accommodation Requests (RARs) to the mandate. In practice, only servicemembers with medical or administrative reasons for an exemption from the mandate are accommodated, and even those sparingly, while RARs are universally denied unless the requester is eligible for administrative separation - i.e. imminently leaving the Service.

3.    All plaintiffs have sincerely held religious beliefs that

---

[1] USCG, *COVID-19 vaccine mandated for all military members* (Aug. 27, 2021), available at: https://www.mycg.uscg.mil/News/Article/2753888/covid-19-vaccine-mandated-for-all-military-members/ (last visited July 11, 2022).

prohibit them from receiving the COVID-19 vaccine and have submitted RARs – none have been granted. Because of their vaccination status, Plaintiffs have been harassed, treated differently than their peers, singled out publicly by their leaders, had their normal leave and liberty restricted, been removed from senior/leadership positions, been denied promotion, received official discipline, been barred from training, travel, new assignments and permanent change of station ("PCS") orders, and face imminent involuntary separation, all while they have continued to perform the mission alongside their "vaccinated" peers, in many cases, while their "vaccinated" peers got sick with Covid-19 in large numbers.[2]

4.     Secretary Austin's August 24, 2021 memorandum states that the only vaccines that may be mandated are those *fully licensed* by the Food and Drug Administration ("FDA") and labeled in accordance with FDA requirements. Due to the unavailability of any FDA-licensed

---

[2] Article 13 of the Uniform Code of Military Justice ("UCMJ") prohibits unlawful restraint and punishment before a servicemember has had a trial and been convicted. *See* Art. 13, UCMJ. Additionally, the Coast Guard's Military Justice Manual (COMDTINST 5810.1H) specifically instructs that "[d]eprivation of normal liberty as a punishment, except as specifically authorized under the UCMJ, is illegal." *Id.*, ¶ A.3.a. For a discussion of the legality, and analysis, of orders restricting the liberty of military criminal accused, *see, generally*, *U.S. v. Milldebrandt*, 8 USCMA 635 (1958); *U.S. v. Mack*, 65 M.J. 108 (CAAF, 2007)("The essential attributes of a lawful order include: (1) issuance by competent authority; (2) communication of words that express a specific mandate to do or not do a specific act; and (3) relationship of the order to a military duty.")

vaccines, however, Defendants Mayorkas and Fagan directed that service members instead take unlicensed, EUA vaccines because Defendants claim that the unlicensed vaccines are "interchangeable" with, and thus may be treated "as if" they were, FDA-licensed and labeled vaccines. Defendants' actions violate the Informed Consent Laws, which expressly prohibit the mandate and coercive measures for medical treatments like unlicensed Emergency Use Authorization ("EUA") vaccines.

5.     The DOD Mandate and Coast Guard Mandate are unconstitutional insofar as Defendants have deprived Plaintiffs of: (1) their rights to free exercise of religion under the First Amendment and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §2000bb-1, *et seq.*; and (2) their rights to due process under the Fifth Amendment because the mRNA shots being forced on servicemen and women are not vaccines, but instead are (gene-therapy) treatments that meet none of the statutory and historical definitions to be considered "vaccines."

6.     The mandates violate the following federal statutes and regulations: (1) informed consent statutes for products subject to an EUA, *see* 10 U.S.C. § 1107a and 21 U.S.C. § 360bbb-3 (collectively, the "Informed Consent Laws"); (2) the substantive provisions of the Public Health Service Act ("PHSA"), 42 U.S.C. § 262; (3) multiple provisions of

the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.; and (4)

the Defendants' own rules and regulations.

7.     Plaintiffs file this action seeking the following declaratory

relief and injunctive relief on behalf of themselves and similarly situated

Coast Guard class members.

(1) Declare that the Defendants' No Accommodation Policy violates services members' rights under RFRA, the First Amendment Free Exercise Clause, and the Fifth Amendment Due Process Clause;

(2) Declare the DoD Mandate and the Coast Guard Mandate to be unlawful and unconstitutional and to vacate these orders;

(3) Enjoin the implementation or enforcement of the DOD Mandate and the Coast Guard Mandate by the Defendants with respect to the Plaintiffs and similarly situated Coast Guard members; and

(4) Enjoin any adverse or retaliatory action against the Plaintiffs as a result of, arising from, or in conjunction with the Plaintiffs' RAR requests or denials, or for pursuing this action, or any other action for relief from Defendants' constitutional, statutory, or regulatory violations.

8.     Plaintiffs bring this action on their own behalf and as a class

action as representative parties on behalf of all members of the class and

subclasses defined herein under the provisions of Federal Rules of Civil

Procedure (the Rules) 23(a) and 23(b). *See infra* Section VII ("Class

Action Allegations"). Plaintiffs seek declaratory and injunctive relief,

and relief incident to it, including, damages, costs and attorney fees.

9.      Plaintiffs seek this relief pursuant to the APA, 5 U.S.C. §§ 702 and 704; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the All Writs Act, 28 U.S.C. § 1651; and 42 U.S.C. § 1988.

## PARTIES

10.      Plaintiffs are members of the Coast Guard who are subject to the DOD Mandate and the Coast Guard Mandate.

11.      Plaintiff Michael Bazzrea is a Senior Chief Petty Officer (SCPO – E-8) in the U.S. Coast Guard Reserve, currently serving at USCG Station Galveston, TX, domiciled in Ardmore, (Carter County), OK. Senior Chief Bazzrea enlisted in the Coast Guard in November of 1994, originally serving as a Machinery Technician (MK). Senior Chief Bazzrea spent the last year of his active duty from 1997-98 as a Deployable Tactical Law Enforcement officer serving in Central and South America. Chief Bazzrea left active duty and became a law enforcement officer,  eventually becoming a federal air marshal in 2002, in which he still serves. *See* Ex. 1, Decl. of SCPO Michael Bazzrea, USCGR, ¶¶1-7.

12.      Senior Chief Bazzrea continued in the Coast Guard Reserve and became a Maritime Enforcement Specialist when the rate was created after 9/11. Since then, he  has served honorably for over 27 years, most of it at USCG Base Galveston, with a 5-year tour at  USCG Sector

Houston from 2015-2020. Chief Bazzrea mobilized back to active-duty multiple times over his career, including for Hurricanes Katrina, Rita, Wilma, Elizabeth, and Harvey (among others), as well as for the Deepwater Horizon Oil Spill, and Operation Enduring Freedom. *Id.*, ¶¶8-11.

13.    Senior Chief Bazzrea caught and tested positive for Covid-19 in July of 2021. In response to the Covid-19 vaccine mandate, Plaintiff Bazzrea submitted an RAR, which was denied. Chief Bazzrea then filed an appeal, which was also denied, and he was told that as soon as "FDA approved" vaccine was available that he would be ordered to take it "regardless of any civil rights complaints" that he might have. He was ordered on July 6, 2022, to take the mRNA shot within 10 days.

> I stated in my appeal that I did not want to take the vaccine and that being forced to do so would put me in duress. However, I was ordered to do so regardless. An email was sent out from USCG District 8 Chief of Staff stating anyone with a denied RA appeal that had not received the vaccination would NOT be eligible for advancement or promotion and that this email would serve as official policy…I was told I would be facing removal from the advancement eligibility list and the inability to take positions such as silver or gold badge positions as well as separation from the Coast Guard.

*Id.*, ¶¶12-17, 21.

14.    Because it was his last chance at advancement to Master Chief (E-9) and because that promotion makes a large financial

difference in retirement to his family, Senior Chief Bazzrea "under great duress, moral conflict, and now with great remorse" took the first shot in order to become compliant "against [his] religious and personal beliefs." *Id.*, ¶¶22.

15.  Plaintiff Sabrina Wilder is an Operations Specialist, Second Class ("PO2") domiciled in Rosharon, TX, currently serving at Coast Guard Vessel Traffic Service (VTS) Houston/Galveston. PO2 Wilder enlisted in the Coast Guard in December 2016 and served aboard the cutter USCGC *Sockeye* for her initial tour before completing "A" school. After her next tour at Coast Guard Sector New England, South Portland, ME, PO2 Wilder was given orders to her current station and moved to Rosharon, TX. *See* Ex. 2, Decl. of PO2 Sabrina Wilder, USCG, ¶¶1-4.

16.  In response to the Covid-19 vaccine mandate, in fall of 2021 Plaintiff Wilder notified her command that she would be submitting an RAR and did so. On Sep. 20, 2021, the Director (of VTS) sent an email regarding how active-duty Coast Guardsmen who sought exemption would be treated. It said:

> NOTE: For both processes [medical or religious] we were told that you are still likely to be Administratively Separated if you receive either exemption. The exemption will just permit you to not receive the vaccine before you are out processed. Please do not think you will be allowed to continue to serve if you are exempted. This was the official

communication in the brief today with the Sector Commander, Chaplin, and Medical present.

This email was followed by another one from the VTS Operations Officer, LT Horstick confirming that "We got word on Friday that just because someone gets an exemption for the vaccine, whether that be religious or medical, does not mean they will not be discharged. The exemption could change the level of discharge whether it be general or honorable… but either way if they don't get the vaccine, they will be discharged." *Id.*, ¶¶6-7.

17.     Despite being twice notified in writing that the process was pointless, PO2 Wilder submitted her Religious Accommodation Request. While it was pending, unvaccinated members were required to walk around base with masks on, thus identifying them to the entire command, and their liberty was restricted to no more than 50 miles from base, while vaccinated service member had no such requirements. Plaintiff's RAR denial was returned in January 2022 and contained obvious factual errors – for example, stating that she worked in "an enclosed, classified space." The VTS where Plaintiff worked is not a classified space. Plaintiff appealed the denial and her appeal was also denied on June 2, 2022. On June 15, 2022, PO2 Wilder was ordered to go to the nearest Walgreen's to receive the vaccine. She refused to do so and

received a CG-3307 Counseling form telling her she is in violation of Art. 90 and Art. 92, UCMJ. PO2 Wilder has less than 8 years of service and therefore does not rate discharge board; she can be summarily discharged. *Id.*, ¶¶8-11.

18.     Plaintiff Aaron Cheatum is a First Class Petty Officer (PO1) in the Coast Guard Reserve serving at USCG Station Galveston, domiciled in Round Rock, TX. PO1 Cheatum enlisted in the Coast Guard in June 2000, completed Quartermaster school, and was assigned to the cutter USCGC *Vashon* in Puerto Rico for his first assignment. PO1 Cheatum's last active duty assignement was at USCG Station Galveston where he became qualified as a Search and Rescue (SAR) Coxswain and a Boarding Officer. *See* Ex. 3, Decl. of PO1 Aaron Cheatum, USCGR, ¶¶1-6.

19.     After 11 years of active duty and an end of tour award for numerous lives saved during SAR operations, PO1 Cheatum joined the Coast Guard Reserves in 2011. In response to the Covid-19 Mandate, PO1 Cheatum submitted an RAR on Nov 29, 2021. PO1 Cheatum received his denial on Jan. 31, 2022, noting that the Coast Guard did "not question the sincerity of [his] religious belief or whether vaccine requirements would substantially burden [his] religious practice." By then PO1 Cheatum had already had Covid-19 and tested positive for it

on Jan. 28, 2022. PO1 Cheatum appealed his RAR denial and that appeal was denied.

> On Jul. 8, 2022, facing a loss of earned retirement, loss of VA benefits, inability to advance in rank, loss of medical insurance, beinfg processed for discharge with a less than Honorable discharge after 22 years, and under duress, I violated my own religious conviction by receiving the initial Covid-19 vaccine.

*Id.*, ¶¶7-12.

20.     Plaintiff Timothy Jorden is a Maritime Enforcement Specialist (Third Class) ("PO3") in the Coast Guard domiciled in Houston (Harris County), TX. He is currently assigned to the Maritime Safety and Security Team (MSST), Houston, TX. Petty Officer (PO3) Jorden originally enlisted in the Marine Corps in August of 2012 and served honorably for 4 years as an infantryman, completing two 6-month, Western Pacific deployments before being discharged in August 2016. He enlisted in the Coast Guard in October 2016 and has been on active duty in the Coast Guard since that time. See Ex. 4, Decl. of PO3 Timothy Jorden, USCG, ¶¶2-4, 7.

21.     PO3 Jorden submitted a Religious Accommodation Request (RAR) in response to the Covid-19 Vaccine Mandate. He received his initial denial on Dec. 03, 2021, and submitted a request for all of the documentation pertinent to his denial on Dec. 09, 2021. He never

received a response. He submitted his appeal to the RA denial on Dec. 17, 2021, in accordance with COMDTINST M1000.15 (series), which required the Coast Guard to respond within 30 days of his appeal. He received a form denial 5 months later that was identical to those of other Coast Guard members he knows, despite being from different commands. PO3 Jorden never heard back on his request for the supporting documentation to be able to respond to in his appeal. *Id.*, ¶¶8, 10, 12-15.

22.    During the time of his RAR submission and appeal, PO3 Jorden has been restricted to within 50 miles of his base – in violation of military law. (*See* cases cited, *supra*, note 2). PO3 Jorden had leave approved to travel home to see his family on July 27, 2021, including his elderly grandparents, but that leave was revoked under the authority ALCOAST 285/21 released on Aug. 6, 2021, and PO3 Jorden's appeal to that decision was denied. This policy remained in effect until ALCOAST 131/22 on Apr. 7, 2022. Likewise, PO3 Jorden and others who were unvaccinated were required to wear masks at work while the "vaccinated" were not. On Sep. 13, 2021, PO3 Jorden was informed that he was non-deployable because of his vaccination status. The very next day he was notified that he would have to be a part of a Presidential security detail and on Sep. 16, 2021, PO3 Jorden traveled across the

country to complete that mission. During the pandemic, PO3 Jorden completed 15 temporary duty assignments away from home for a total of 189 days, while simultaneously denied normal liberty and leave outside of 50 miles of his assigned duty station. Plaintiff Jorden tested positive for Covid-19 in January 2022 and was quarantined and returned to work upon the completion of the quarantine period. *Id.*, ¶¶18, 20.

23.    Plaintiff Caleb Wadsworth is a Lieutenant (LT) in the U.S. Coast Guard, domiciled in Joshua, Johnson County, TX, assigned to USCG Sector/Air Station Corpus Christi, TX. LT Wadsworth is a Rotary Wing Aeronautical Engineering Officer and an MH-65D pilot. He graduated from the Coast Guard Academy in 2013 and completed flight training in Pensacola, FL, after which he was assigned as a Search and Rescue (SAR) pilot to Port Angeles, WA. Following that assignment, LT Wadsworth was a SAR pilot in Kodiak, Alaska, and then flew national security missions between the United States and Russia. While in Kodiak, LT Wadsworth applied for and was selected to the USCG Aeronautical Engineering program. *See* Ex. 5, Decl. of LT Caleb Wadsworth, USCG, ¶¶2-4.

24.    In response to the Coast Guard Mandate LT Wadsworth submitted an RAR on Sep. 28, 2021. This initial RAR was denied on Dec. 2, 2021, while affirming that LT Wadsworth's religious beliefs were

"sincere." LT Wadsworth submitted an appeal to that denial on May 17, 2022. LT Wadsworth was then officially counseled (via CG-3307 form) on June 2, 2022, and ordered to report to the Corpus Christi Medical Clinic by June 8, 2022, to receive a "fully FDA approved Covid-19 vaccine," under threat of punishment for violating Art. 90 and Art. 92, UCMJ.

> On this form I annotated that taking a COVID-19 vaccine was against my well documented religious beliefs and that there was no FDA approved vaccine available for administration, which would negate the legality of the order to vaccinate… On 03 JUN2022, I reported to the Air Station Corpus Christi Clinic, as ordered, and documented what vaccines were available for administration….

> After talking with my flight doctor, Dr. DeArman, I learned that Air Station Corpus Christi did not have any COVID-19 vaccines. Dr. DeArman assisted in attempting to locate a vaccine by calling [nearby] NAS Corpus Christi clinic, but she was unable to locate an FDA Approved vaccine.

> On 06-07 June 20200, I visited four separate clinics in our area in an attempt to gain access to an FDA approved/labeled vaccine. At each clinic I had health care professionals document NDC's and lot numbers for the vaccines they had in stock, all of which were labeled as EUA vaccines. These details were captured in photos, documented in memo format, signed by health care professionals and a witness, and forwarded to my commanding officer…

*Id.*, ¶¶7-11.

25.   LT Wadsworth went on to notify CG District 8 Legal and was told that "these vaccines could be administered interchangeably and I

was required to vaccinate with what was available or I would be in violation of Article 90 and 92." On June 8, 2022, LT Wadsworth receive a negative counseling (CG-3307) that he "failed to report to the clinic as ordered," for his first shot. This was demonstrably untrue, yet Plaintiff Wadsworth was counseled for violating both Art. 90 and 92.[3] LT Wadsworth was told he is now no longer eligible to promote. LT Wadsworth also offered less restrictive means to achieve the government's compelling interest, by providing proof of his natural immunity from an infection on Aug. 11, 2021. Plaintiff LT Wadsworth provided that information in his RAR appeal, as well. As a result of this, LT Wadsworth was…

> treated poorly by my command and they flagrantly admitted to trying to coerce me into vaccinating, which was against my religious beliefs. I missed once in a lifetime family events, which my command admitted had nothing to do with health and safety, but was an attempt to encourage vaccination. These statements

---

[3] Charging a service member who disobeys a General Order or Regulation should only be charged as a single violation under Art. 92, UCMJ, under the "ultimate offense doctrine." Absent some truly unusual circumstances, the act of disobedience cannot multiply a military accused's criminality simply by the highest order's reissuance/repetition down the chain of command. *See, e.g.*, Naval Justice School Crim Law Study Guide, Rev. 3/06, CR4.8, pp. 168-69 ("In general, this concept means that an accused should be ***punished*** for underlying misconduct if there was a pre-existing order or duty, even though he / she may have simultaneously disobeyed an order of a superior."); and cases cited therein. *U.S. v. Quarles*, 1 M.J. 231 (CMA, 1975).

> and justifications were documented in official Coast
> Guard emails and voice recordings…

*Id.*, ¶¶12-15.

26.     Defendant DOD is an agency of the United States Government. It is led by Secretary of Defense Lloyd Austin, III who is sued in his official capacity.

27.     Defendant FDA is an agency of the United States Government. It is led by acting Commissioner Janet Woodcock, who is sued in her official capacity.

28.     Defendant DHS is an agency of the United States Government. It is led by DHS Secretary Alejandro Mayorkas, who is sued in his official capacity.

29.     Defendant USCG is an agency of the United States Government. It is led by USCG Commandant, Linda Fagan, who is sued in here official capacity.

## JURISDICTION AND VENUE

30.     This case arises under federal law, namely, the First and Fifth Amendments of the United States Constitution, U.S. Const. Amends. I & V; RFRA, 42 U.S.C. §2000bb-1, *et seq*.; the APA, 5 U.S.C. § 551, *et. seq*.; 10 U.S.C. § 1107a; 21 U.SC. § 360bbb-3; and 42 U.S.C. § 262.

31.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution and federal law; 28 U.S.C. § 1346 because this is a civil action against the United States; 8 U.S.C. § 1361 to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiff; and 42 U.S.C. § 2000bb-1(c) because Plaintiffs' religious exercise has been burdened by Defendants.

32.     This Court has authority to award the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 & 2202; the requested injunctive relief pursuant to 28 U.S.C. § 2202; and costs and attorneys' fees pursuant to 28 U.S.C. § 2412 and 42 U.S.C. § 1988(b).

33.     The challenged agency actions (*i.e.*, DOD Mandate, Coast Guard Mandate, DOD Interchangeability Directives, and No Accommodation Policy) are final agency actions, as they mark the consummation of the agency's decision-making process with respect to the DOD's imposition of a vaccine mandate to which Plaintiffs are subject. The DOD Mandate, Coast Guard Mandate, and DOD Interchangeability Directive are *ultra vires* actions in violation of Plaintiffs' federal statutory rights, and to the extent these statutes do not create a right of action, Defendants' actions are agency actions for

which there is no other adequate remedy in a court that may be brought pursuant to the APA. 5 U.S.C. § 704.

34.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(e)(1) and §1402(a)(1) because a number of the Plaintiffs are domiciled or stationed in the Southern District of Texas. Other members of the plaintiff class are aboard both Defendant DOD and DHS reservations, stations, and ships in the court's district subject to the DOD and Coast Guard Mandates, and all members are directly affected by and subject to its mandate to take experimental, EUA shots.

## STATEMENT OF FACTS

### I.    COVID-19 VACCINE MANDATES

#### A.    COVID-19 Discovery and Public Health Emergency

44.    On January 29, 2020, the White House Coronavirus Task Force was established to oversee and coordinate the Trump Administration's response to COVID-19. On January 31, 2020, as a result of confirmed cases of COVID-19, HHS Secretary Azar determined that a public health emergency existed as of January 27, 2020, pursuant to Section 319 of the PHSA, 42 U.S.C. § 247d *et seq*.

#### B.    DOD MANDATE

45.    On August 24, 2021, SECDEF issued the DOD Mandate, directing the Secretaries of the Military Departments "to immediately

begin full vaccination of all members of the Armed Forces … who are not fully vaccinated against COVID-19." Ex. 6, DOD Mandate, at 1. The Secretary further directed that mandatory vaccination "will only use COVID-19 vaccines that receive full licensure from the [FDA], in accordance with FDA labeling and guidance," and that vaccination requirements are "to be implemented consistent with DoD Instruction 6205.02." *Id*. The SECDEF Memo does not mention EUA or "BLA-compliant" vaccines at all, much less mandate the administration of such vaccines pursuant to the mandate.

46.    The only service members expressly exempted are those "actively participating" in vaccine trials, while "[t]hose with previous COVID-19 infection are not considered fully vaccinated" and thus are not exempted. *Id*.

47.    On September 14, 2021, Assistant Secretary of Defense for Health Affairs, Ms. Terry Adirim, directed the Surgeon Generals of the Air Force, Army and Navy that, with respect to the Pfizer/BioNTech COVID-19 vaccine, "health care providers should use doses distributed under the EUA to administer the vaccination as if the doses were the licensed [Comirnaty] vaccine." Ex. 7, September 14, 2021 Adirim Memo, at 1. On May 3, 2022, the DOD issued the same directive that EUA Moderna COVID-19 vaccines were to be used interchangeably with, and

"as if," they were the FDA-licensed and labeled Moderna Spikevax vaccine. *See* Ex. 8, May 3, 2022 Adirim Memo, at 1.

## C. Coast Guard Mandate

48.    On August 26, 2021, Commandant issued the Coast Guard Mandate in ALCOAST Message 305/21, subject "MANDATING COVID-19 VACCINATION FOR MILITARY MEMBERS" (the "Coast Guard Mandate" or "ALCOAST 305/21"). *See* Ex. 9. The Coast Guard Mandate incorporates the provisions of the DOD Mandate.

49.    The Coast Guard Vaccine Mandate (incorrectly) claims  that "[t]he Pfizer-BioNTech COVID-19 was granted license by the Food and Drug Administration (FDA) on 23 Aug 2021." *Id*. The Coast Guard Mandate directed all U.S. active-duty and Reserve personnel to become "fully vaccinated" and claimed that "[v]accines are readily available at Coast Guard clinics, military treatment facilities, and civilian healthcare providers." *Id*.

## D.    Medical and Administrative Exemptions

50.    Commandant Instruction (COMDTINST) 6230.4 (series) Immunizations and Chemoprophylaxis, establishes Coast Guard policy and quality standards for immunization and chemoprophylaxis. *See* Ex. 10 ("AR 40-562" or "COMDTINST 6230.4"). Paragraph 2-6 provides for two types of exemptions from immunization requirements: medical

and administrative. Among the numerous medical exemptions available to service members, "evidence of immunity based on serologic tests, documented infection, or similar circumstances" provide a basis for medical exemption. The administrative exemptions available to service members include those who are within 180 days of their separation or retirement date and those who seek religious accommodation.

### E.   Disciplinary Actions for Vaccine Refusal

51.   The Coast Guard Mandate states that "Commanding Officers and leaders shall not commence administrative action or disciplinary action based solely on a Service member's decision to decline vaccination until such implementing guidance is promulgated." ALCOAST 305/21, ¶7.

52.   Defendant USCG followed with ALCOAST 315/21 on Sep. 7, 2021. This order made the claim that "[g]iven the need to safeguard the workforce, and maintain readiness, the Coast Guard will determine additional measures to mitigate health risks to members of the Service and our communities *posed by those who are not yet vaccinated*. These measures may include additional restrictions on official travel, liberty, and leave, as well as cancellation of "A" and "C" school orders," See Ex. 11, ALCOAST 315/21, ¶3 (emphasis added).

53.   There is no evidence now, nor was there at the time of the

issuance of the order, that unvaccinated servicemembers posed any higher threat of transmission of Covid-19 to their communities or co-workers than their "vaccinated" counterparts.

54.    Defendant USCG's message also asserted the following: "This message constitutes a lawful general order. Failure to comply with its provisions is a failure to obey a lawful order punishable under Article 92 of the Uniform Code of Military Justice (UCMJ). It may result in punitive and/or administrative action, including the initiation of discharge proceedings." *Id.*, at ¶7.

## II.    RELIGIOUS    ACCOMMODATIONS    AND    SECULAR EXEMPTIONS FROM DOD MANDATE & USCG MANDATE

### A.    Defendants' Religious Accommodation Request Rules and Procedures.

55.    The DOD and the Coast Guard have adopted guidance, procedures, and evaluation criteria for religious accommodation requests. *See generally* Ex. 12, DOD Instruction 1300.17, "Religious Liberty in the Military Services" (Sept. 1, 2020)("DODI 1300.17")(DOD-wide procedures). DODI 1300.17 provides that it is DoD policy that "[s]ervice members have the right to observe the tenets of their religion or to observe no religion at all, as provided in this issuance." *Id.* DODI 1300.17 further provides that, "DoD Components will accommodate individual expressions of sincerely held beliefs … which do not have an

adverse impact on military readiness, unit cohesion, good order and discipline, or health and safety. A Service member's expression of such beliefs may not, in so far as practicable, be used as the basis of any adverse personnel action, discrimination, or denial of promotion, schooling, training, or assignment." *Id.*, ¶1.2.b. DODI 1300.17 further provides that, "[i]n accordance with RFRA," if a military policy "substantially burdens a Service member's exercise of religion, accommodation can only be denied if" the policy "(1) … is in furtherance of a compelling governmental interest, and "(2) It is the least restrictive means in furtherance of that compelling governmental interest." *Id.*, ¶ 1.2.e. With respect to appeals, DODI 1300.17 requires RAR appeals to be submitted and routed through the chain of command. *See* DODI 1300.17, ¶ 3.2.f. Delegations outside of the chain of command are not authorized.

56. The Coast Guard implemented RFRA and DODI 1300.17 through COMDTINST 1000.15, Military Religious Accommodation, ("COMDTINST 1000.15"). *See* Ex. 13. The USCG published COMDTINST 1000.15 for the first time four days after it issued the Coast Guard Mandate on August 30, 2021. COMDTINST 1000.15 provides that the Coast Guard's policy "is to provide reasonable accommodations to the observances of the religious faith practiced by

individual members when these doctrines or observances will not have an adverse impact on military readiness, individual or unit readiness, unit cohesion, health, safety, discipline, or mission accomplishment." *Id.*, ¶11.a.

57.     The instruction also provides that "[a]ll requests for accommodation must be reviewed and acted upon by the appropriate approval authority and during the timelines outlines in Enclosure (1), insofar as practicable and as operations allow." *Id.*, ¶ 11.a.(2).

58.     The Coast Guard's actual procedures applied to evaluate RARs for COVID-19 vaccines differ from the published rules, based on the experience and declarations of the 122 Plaintiffs who have submitted RARs in this case.

59.     The Coast Guard timeline for completion of the RAR states that it will be returned to the member within 30 days. *Id.*, at Encl 1. After receiving a denial, the process is supposed to be, as follows:

> (1)     Unit commanders must inform the requesting member of the right to appeal the decision. Any notice of denial must inform members that they have the right to file an Equal Opportunity complaint by contacting a Civil Rights Service Provider within 45 calendar days of any denial.

> (2)     A member who has been denied a religious accommodation, in whole or in part, may submit a written appeal to the official in the chain of command or chain of supervision one level above the officer or official who took the final action on the request. The appeal must be routed

through the officer or official who denied the request. The appeal must include the specific basis on which the member believes the initial denial was in error.

(3)     The appellate authority will either overturn or uphold the contested decision, in part or in full, within 30 days of the date of appeal for cases arising within the continental United States, and within 60 days for all other cases, if practicable and as operations allow.

*Id.*, ¶12.j.

60.     None of the 122 Plaintiffs who filed an RAR received their response within the required 30-day deadline. Of those that took an administrative appeal, none have received a response within the 30 days required for the appeal; indeed, most waited for a response to their initial RARs and appeals for more than 4 months.

**B.     Religious Accommodation Requests & Appeals.**

61.     This is largely in keeping with the same process that has been observed throughout the military during the DoD Vaccine Mandate. Evidence submitted in a related proceeding in another District, *Navy SEAL 1 v. Biden*, No. 8:21-cv-02429-SDM-TGW (M.D. Fla.) ("*Navy SEAL 1* Proceeding"), conclusively demonstrates that the Armed Services have systematically and willfully violated service members' free exercise rights under RFRA and the First Amendment. The Coast Guard does not appear to have published up-to-date statistics on religious accommodations requests, denials, and appeals. Accordingly, the Table

below presents statistics provided by Defendants and the other Armed Services in the *Navy SEAL 1* Proceeding as of February 2022. *See* Ex. 14, *Navy SEAL 1 v. Austin*, No. 8:21-cv-2429-SDM-TGW (M.D. Fla. Feb. 4, 2022), "Third Notice of Compliance," ECF 73 ("February 4, 2022 Compliance Notice").

**Table 1: Religious Accommodation Requests & Appeals**

| Armed Service | Initial RA Requests | | | RA Appeals | | |
|---|---|---|---|---|---|---|
| | Filed | Denied | Approved | Appeals | Denied | Approved |
| Air Force | 12,623 | 3,180 | 5 | 2,221 | 443 | 1 |
| Army | 3,523 | 391 | 0 | 55 | 0 | 0 |
| USCG | 1,308 | 578 | 0 | 224 | 0 | 0 |
| USCMC | 3,539 | 3,458 | 0 | 1,150 | 119 | 3 |
| Navy | 4,095 | 3,728 | 0 | 1,222 | 81 | 0 |
| Total | 25,008 | 11,335 | 5 | 4,872 | 643 | 4 |

62. Courts elsewhere have concluded that the Defendant DOD's religious exemption process appears to be a "sham," *Navy SEAL 1 v. Biden,* No. 8:21-cv-2429, 2021 WL 5448970 (M.D. Fla. Nov. 22, 2021), and a "quixotic quest" that amounts to little more than "theater." *Air Force Officer v. Austin*, --- F.Supp.3d ---, 2022 WL 468799, at *1 (M.D. Ga. Feb. 15, 2022) ("*Air Force Officer*") (citation omitted). In other proceedings, other Armed Services have acknowledged that religious accommodations granted were only for those service members who were

imminently leaving service and/or who would otherwise qualify for administrative exemption.[4]

## III.   COMPARISON OF EUA TREATMENTS WITH FDA-LICENSED AND LABELED COVID-19 TREATMENTS

### A.   FDA Emergency Use Authorization

63.   The Food, Drug and Cosmetic Act ("FDCA") authorizes the FDA to issue an EUA for a medical drug, device, or biologic, where certain conditions have been met. The conditions include a declaration by the Secretary of Health and Human Services of a public health emergency that justifies the use of an EUA, 21 U.S.C. § 360bbb-3(b)(1), and a finding by the FDA that "there is no [1] adequate, [2] approved, and [3] available alternative to the product for diagnosing, preventing, or treating" the disease in question. 21 U.S.C. § 360bbb-3(c)(3).

64.   There are significant differences between licensed vaccines and those subject to EUA that render them "legally distinct." Ex. 15, August 23, 2021 Pfizer/BioNTech EUA Re-Issuance Letter, at 2 n.8. First, the requirements for efficacy are much lower for EUA products than for licensed products. In particular, rather than requiring an applicant to prove that a vaccine is safe and effective (or potent) based

---

[4] *See Navy SEAL 1 v. Austin*, --- F.Supp.3d ---, 2022 WL 534459, at *19 (M.D. Fla. Feb. 18, 2022) ("*Navy SEAL 1*") (finding that Marine Corps RAR approvals only granted to those on terminal leave). *See also Poffenbarger v. Kendall*, 2022 WL 594810, at *13 n.6 (S.D. Oh. Feb. 28, 2022) ("*Poffenbarger*").

on well-controlled clinical trials, mere speculation is sufficient to grant an EUA. EUAs require only a showing that, based on scientific evidence "if available," "it is reasonable to believe," the product "may be effective" in treating or preventing the disease. 21 U.S.C. §360bbb-3(c)(2)(A). Second, the safety requirements are minimal, requiring only that the FDA conclude that the "known and potential benefits … outweigh the known and potential risks" of the product, considering the risks of the disease. 21 U.S.C. §360bbb-3(c)(2)(B). Third, EUA products are exempt from certain manufacturing and marketing standards, enjoy broader product liability protections, and cannot be mandated due to informed consent laws and regulations.

### B.    Informed Consent Requirements for EUA Products

65.    The FDA's grant of an EUA is subject to statutorily mandated informed consent requirements to "ensure that individuals to whom the product is administered are informed" that they have "the option to accept or refuse administration of the product." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III). For the COVID-19 vaccines, FDA implemented the "option to accept or refuse" condition in each letter granting the EUA by requiring that FDA's "Fact Sheet for Recipients and Caregivers" be made available to every potential vaccine recipient. *See, e.g.,* FDA, "Fact Sheet for Health Care Providers Administering Vaccine

(Vaccination Providers)," (Pfizer/BioNTech COVID-19 vaccine) at 14 (Aug. 23, 2021, revised July 8, 2022) ("Pfizer/BioNTech Fact Sheet"), *available at*: https://www.fda.gov/media/153713/download (last visited July 11, 2022).

### C.    FDA Vaccine Licensing and Approval

66.    The FDCA generally prohibits anyone from introducing or delivering for introduction into interstate commerce any "new drug," which includes "biological product" unless and until the FDA has approved the drug or biological product as safe and effective for its intended use. 21 U.S.C. §§ 331(a), 355(a).

67.    Pursuant to Section 351(a) of the PHSA, 42 U.S.C. § 262(a), the FDA has the authority to approve the sale and manufacture of vaccines and other biologics like the Comirnaty and Spikevax vaccines. The biologics application addresses not only the safety and efficacy of the product, but also covers specific labeling and manufacturing requirements, including the manufacturing location, process, and storage requirements.

68.    The PHSA expressly prohibits the sale of any "biological product" in interstate commerce "unless a biologics license application ["BLA"] … is in effect for the biological product," 42 U.S.C. § 262(a)(1)(A), and the package is "plainly marked with" "the proper name of the

biological product," (*e.g.,* Comirnaty or Spikevax) and "the name, address and applicable license number of the manufacturer." 42 U.S.C. § 262(a)(1)(B)(i)-(ii). These labeling requirements are mandatory, not discretionary. *See* 21 C.F.R. § 610.60(a)(1)(2) (directing that the "proper name" and "license number" "shall appear on the label" of biological product); *see also* 21 C.F.R. § 207.37(a)(2) (a product is "deemed … misbranded" if labeling codes used to "denote or imply FDA approval of [an unapproved] drug"). EUA products, by contrast, must be marked as such, and cannot include the license number.

### D.  Comirnaty Approval and EUA Re-Issuances

69.  On August 23, 2021, the FDA approved the May 18, 2021, Comirnaty application for individuals 16 years or older. The Comirnaty Approval Letter approves the sale of Comirnaty Vaccine, as well as the specific manufacturing facilities, processes, ingredients, storage, and distribution requirements that were not addressed in the EUA reissuances.

70.  Also on August 23, 2021, the FDA re-issued the EUA for the Pfizer/BioNTech Vaccine for individuals 16 years or older and for children aged 12 to 15 years. The FDA extended and expanded the existing EUA because Comirnaty was not available. *Id.*, at 5 n.9. In subsequent EUA re-issuances, the FDA has stated that the multiple,

distinct formulations of the licensed and EUA vaccines may be used interchangeably because they are "analytically comparable."[5]

71.    On September 13, 2021, the National Institutes of Health ("NIH") posted an announcement by Pfizer that Pfizer "does not plan to produce any product with these new [Comirnaty] NDCs and labels over the next few months while the EUA authorized product is still available and being made available for U.S. distribution." *See* Ex. 16, NIH-Pfizer Announcement of Comirnaty Unavailability. The FDA has subsequently confirmed that Comirnaty remains unavailable in the United States.[6]

### E.    Spikevax Approval and EUA Re-Issuance

72.    On January 31, 2022, the FDA approved Moderna's BLA for Spikevax. Also on the same date, the FDA re-issued the EUA for the Moderna COVID-19 vaccine, once again asserting that the "legally distinct" EUA and licensed versions "can be used interchangeably" because they have the "same formulation."[7] And once again, as with

---

[5] *See, e.g.,* FDA, Pfizer BioNTech EUA Re-Issuance Letter, at 16-17 (July 8, 2022) ("July 8, 2022 Pfizer/BioNTech EUA Re-issuance"), *available at*: https://www.fda.gov/media/150386/download (last visited July 11, 2022).

[6] *See, e.g.,* FDA, Summary Basis for Regulatory Action – COMIRNATY, at 5 (Nov. 8, 2021) ("Nov. 8, 2021 Comirnaty SBRA"), *available at*: https://www.fda.gov/media/151733/download (last visited July 11, 2022); July 8, 2022 Pfizer/BioNTech EUA Re-issuance at 12 & n 23.

[7] *See* FDA, Moderna EUA Reissuance Letter at 16 (June 17, 2022) ("June 17, 2022 EUA Re-Issuance"), *available at*: https://www.fda.gov/media/144636/download (last visited July 11, 2022).

Comirnaty, the FDA noted that "there is not sufficient approved vaccine available" for the eligible population. *Id.* at 8 n.13.

**F.    Legal Differences Between EUA and Licensed Vaccines**

73.    Defendants assert that licensed and EUA vaccines are legally interchangeable for the purposes of the DOD Mandate, *i.e.*, that EUA vaccines may be legally mandated, notwithstanding the express prohibition in 10 U.S.C. § 1107a.

74.    The FDA has never asserted that the EUA and licensed versions are legally interchangeable. The FDA's EUA reissuance letters have consistently acknowledged that the two vaccines are "legally distinct." *See, e.g.,* Ex. 14, Aug. 23, 2021 EUA Re-Issuance Letter, at 2 n.8. The FDA's witness in this proceeding confirmed that the FDA has not made any "statutory interchangeability determination" and instead described the products as only "medically interchangeable." Ex. 17, Marks Decl., ¶¶ 10-11. This simply means that one dose of an EUA vaccine and one dose of a licensed vaccine may be used to administer a two-dose vaccine regimen. *See, e.g.,* Ex. 18, Congressional Research Service, *FDA Approval of the Pfizer-BioNTech COVID-19 Vaccine: Frequently Asked Questions* at 5 (Updated Sept. 29, 2021) ("CRS Report").

75.     The EUA is a "distinct regulatory pathway" under 21 U.S.C. § 360bbb-3 from FDA licensing under the PHSA. CRS Report at 1. For FDA licensure under the PHSA, the applicant must satisfy the distinct and higher statutory requirements regarding safety, purity, and potency (or effectiveness), as well as distinct requirements for FDA approval of biologics manufacturing and labeling that are not required for EUA products. Accordingly, even if the EUA and licensed product had the "same formulation" – and as discussed below there is evidence in the record that they do not – the EUA version "is legally distinct and can be manufactured, marketed, distributed and administered only pursuant to the EUA." *Id.* at 5. One of these key "legal distinctions" is that an FDA-approved vaccine may be mandated, while an EUA vaccine may not be without a signed Presidential authorization, which Defendant Austin has neither requested nor received.

76.     The publicly available information indicates that there are differences in the composition of the EUA and licensed products. *See, e.g., Doe#1-#14 v. Austin*, 2021 WL 5816632, at *3 n.5 (N.D. Fla. Nov. 12, 2021) ("*Austin*"). There is also no dispute that the FDA EUA did not address manufacturing processes or locations, which are solely addressed in the Comirnaty licensure. In any case, the FDA documents severely understate the complexities of the novel mRNA vaccines and

nanolipid delivery systems, which Pfizer has stated include "more than 280 materials," rather than 10 or 11 disclosed in FDA filings, "made by suppliers in 19 countries."[8]

## IV.   SCIENTIFIC   EVIDENCE   AND   ADMINISTRATIVE ACTIONS FOR COVID-19 MRNA "VACCINES"

### A.   Novel Technology with Insufficient Clinical Trial Data

77.   The Pfizer-BioNTech and Moderna COVID-19 treatments employ novel technology, namely, mRNA delivered by nanolipids. These products are considered "genetic vaccines" or "or vaccines produced from gene therapy molecular platforms."  Ex. 19, McCullough Decl., ¶ 17. As Dr. McCullough explains, the mRNA "vaccines" "have a dangerous mechanism of action in that they all cause the body to make an uncontrolled quantity of the pathogenic wild-type spike protein from the SARS-CoV-2 .... This is *unlike all other vaccines* where there is a set amount of antigen or live-attenuated virus." *Id.* (emphasis added).

### B.   COVID-19 Vaccines Do Not Prevent Spread of Omicron.

78.   None of the COVID-19 vaccines have "demonstrated in a conclusive, randomized, placebo-controlled trial" that they "reduce the

---

[8] Stephanie Baker & Vernon Silver, *Pfizer Fights to Control Secret of $36 Billion Covid Vaccine Recipe*, Bloomberg (Nov. 14, 2021), available at: https://www.bloomberg.com/graphics/2021-pfizer-secret-to-whats-in-the-covid-vaccine/ (last visited July 11, 2022).

risk of Omicron infection or any of its complications." Ex. 20, McCullough Supp. Decl., ¶ 8. Further, "COVID-19 vaccinations do not impede the chances that a person will transmit the [Omicron variant] to another person." *Id.*, ¶ 9. This is because the spike protein produced by the vaccines, which was developed using the original Alpha variant, has long since become "obsolete" with the emergence of the Delta variant and Omicron variants. *See* Ex. 19, McCullough Decl., ¶ 18 (Delta variant); *see also* Ex. 20, McCullough Supp. Decl., ¶ 10 (Omicron variant).

### C.   Vaccine Injuries and Side Effects

79.    The VAERS data reveal unprecedented levels of death and other adverse events since the FDA issued EUAs for the three COVID vaccines. The total safety reports in VAERS for all vaccines per year up to 2019 was 16,320. By comparison, the total VAERS safety reports for COVID-19 Vaccines "alone through October 1, 2021, is 778,683." Ex. 19, McCullough Decl., ¶ 27. Through April 2022, COVID-19 vaccination "has led to more than 12,000 deaths and more than 13,000 permanently disabled Americans." Ex. 20, McCullough Supp. Decl., ¶ 17.

80.    The COVID-19 vaccines pose a particular risk of myocarditis (heart inflammation) to those who are in the prime ages for military service. Ex. 19, McCullough Decl., ¶ 30. Due to these risks, in Dr. McCullough's expert medical opinion, "no individual under age 30 under

any set of circumstances should feel obliged to take this risk with the current genetic vaccines particularly the Pfizer and Moderna products." *Id.*, ¶ 32. *See also* Ex. 20, McCullough Supp. Decl., ¶ 12 (discussing FDA myocarditis warnings).

### D. Superiority of Natural Immunity to Vaccination and Risks of Vaccination to Those with Naturally Immunity.

81.     Numerous studies demonstrate the superiority of natural immunity over vaccine-induced immunity. *See generally* Ex. 19, McCullough Decl., ¶¶ 52-57 & studies cited therein. In Dr. McCullough's expert opinion, "SARS-CoV-2 causes an infection in humans that results in robust, complete, and durable immunity, and is superior to vaccine immunity." *Id.*, ¶ 53. Further, "there are no randomized placebo-controlled … trials of COVID-19 vaccination … demonstrating any clinical benefit" for those who have recovered from a previous infection. Ex. 20, McCullough Supp. Decl., ¶ 12.  There is, however, significant evidence that those with previous infections face greater risks of adverse reactions from the vaccines, as well as a greater rate and severity of subsequent COVID-19 infections than those with previous infections who remained unvaccinated. *See id.*, ¶ 12 & studies cited therein; *see also* Ex. 19, McCullough Decl., ¶¶ 49-51 & studies cited therein. Thus, in

his expert opinion, "COVID-19 vaccination is contraindicated in COVID-19 survivors." Ex. 20, McCullough Supp. Decl., ¶ 12.

## V.   PLAINTIFFS RELIGIOUS ACCOMMODATION REQUESTS

### A.   Plaintiffs' Sincerely Held Religious Beliefs

82.   All Plaintiffs have been found to have sincerely held religious beliefs that compel them to request an exemption from the Mandate. *See, e.g.,* Ex. 3, Decl. of PO1 Aaron Cheatum, USCGR, p.3, ¶9.

83.   Plaintiffs object to taking the gene therapies because all of the existing "vaccines" used aborted fetal cell lines either in their manufacturing or development. (*See infra* V.B). Some also feel that the COVID-19 treatments alter God's creation, *i.e.*, their genetic codes or immune system, in violation of God's commandments

84.   Plaintiffs also believe that the mandate is forcing them to choose between God and country and/or following an unlawful and unethical order. In at least 2 cases, Plaintiffs took the first shot under duress because of the threats to the careers in the military. *See, e.g.*, Ex. 1, Decl. of SCPO Michael Bazzrea, p. 5, ¶22; *see also* Ex. 3, Decl. of PO1 Aaron Cheatum, USCGR, p. 3, ¶12.

### B.   COVID-19 Vaccines Are Critically Dependent on, and Could Not Exist but for, the Use of Aborted Fetal Cell Tissue.

85.   It is undisputed that HEK-293 and PER.C6 fetal cell lines

were used in the development and testing of the three (3) available COVID-19 vaccines. As reported by the North Dakota Department of Health, in its handout literature for those considering one of the COVID-19 vaccines, "[t]he non-replicating viral vector vaccine produced by Johnson & Johnson did require the use of fetal cell cultures, specifically PER.C6, in order to produce and manufacture the vaccine."[9] The Louisiana Department of Health likewise confirms that the Johnson & Johnson COVID-19 vaccine used the PER.C6 fetal cell line, which "is a retinal cell line that was isolated from a terminated fetus in 1985."[10]

86.     The same is true of the Moderna and Pfizer-BioNTech mRNA vaccines. The Louisiana Department of Health's publications again confirm that aborted fetal cells lines were used in the "proof of concept" phase of the development of their mRNA vaccines. *See id.* The North Dakota Department of Health likewise confirms: "fetal cells were used for 'proof of concept' (to demonstrate how a cell could take up mRNA

---

[9] *See* North Dakota Health, *COVID-19 Vaccines & Fetal Cell Lines* (Oct. 5, 2021) ("NDH FAQ"), available at:
https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Page/COVID-19_Vaccine_Fetal_Cell_Handout.pdf (last visited July 11, 2022).

[10] La. Dept. of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 21, 2020), available at:
https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf (last visited July 11, 2022)

and produce the SARS-CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein." *See* NDH FAQ. Multiple Pfizer executives have confirmed both that aborted fetal cells were critical for development, while at the same time trying to cover this up this essential fact.[11]

### C. Plaintiffs' RARs and Appeals Have Been Denied with "Magic Words," Rather Than Individualized Assessments.

87.    Every Plaintiff has had their initial RAR request denied with two exceptions, who have simply never heard back on their request. Moreover, Defendants have "rubber stamped" denials on Plaintiffs' RAR requests and/or appeals using the same "magic words," formulaic language, and theoretical speculation, without any individualized evaluation "to the person" required by RFRA or consideration of mission impact required by service regulations.

88.    That is for those who actually get their RAR denial back; many, such as Plaintiff LTJG Reynolds and PO3 Jorden, get nothing more than an email telling them that their RAR has been denied and that they will have to request their RAR using the Freedom of

---

[11] See Project Veritas, PFIZER LEAKS: Whistleblower Goes On Record, Reveals Internal Emails from Chief Scientific Officer & Senior Director of Worldwide Research Discussing COVID Vaccine ... 'We Want to Avoid Having the Information on the Fetal Cells Floating Out There', (Oct. 6, 2021), available at: www.projectveritas.com/news/pfizer-leaks-whistleblower-goes-on-record-reveals-internal-emails-from-chief/ (last visited Feb. 8, 2022).

Information Act (FOIA) process.[12] *See*, *e.g.*, *supra* ¶¶15, 19.

89. The Coast Guard's RAR appeal denial letters are nearly identical form letters. Multiple Plaintiffs (from different commands) have compared their letters and found the same form denials. *See, e.g.*, Decl. of PO3 Jorden & *supra* ¶ 15.

90. No person's individual circumstances were "taken into consideration" in any meaningful sense. The appeals are being categorically denied without any particularized review, as required by RFRA and the First Amendment. These form letters end the careers of Coast Guardsmen who have devoted their adult lives to serving the United States. They deserve better, and at a minimum what the law requires.

91. Regarding the government Defendant's burden to consider the least restrictive means to accomplish their "compelling government interest," Defendant's ALCOAST orders specifically ignore Plaintiffs with previous documented infections and all of the massive data and scientific evidence supporting "natural immunity," either on its own or in combination with other alternative restrictions (*e.g.*, testing & quarantine, masking, social distancing) that would provide a less

---

[12] It is Plaintiffs' legal position that Defendant's refusal to provide their own RAR paperwork is also illegal and an egregious abuse of the FOIA process.

restrictive means of achieving the Coast Guard's compelling government interests.

92.     Additionally, as Plaintiff Jorden's declaration shows, the supposed "compelling government interest" in "health and safety" of the "unvaccinated" instantly evaporates when its suits the government's purposes. Plaintiff Jorden has his leave and liberty restricted as a general matter, and was told he was non-deployable, but the very next day when his particular expertise was necessary to support missions around the country, including a Presidential protective detail, his "threat" to others instantly evaporated. This is just one instance of many showing that the entire framework and claims about the unvaccinated are nothing more than facade.

93.     **Alternative "Ethical" Vaccines.** Some Plaintiffs are willing to take an alternative, traditional vaccine that is fully licensed to which they do not have religious objections. However, to do so at this time would require the Plaintiffs to take leave and conduct international travel at their own expense as no such alternatives are currently available in the United States. Covaxin, for example, is only available in India.

94.     Defendants' dismissive treatment of Plaintiffs request to accommodate their sincerely held religious beliefs is consistent with

their treatment of tens of thousands of other service members. The Plaintiffs' experience as a cohort, and the Defendant's own record of denials, demonstrate that it has granted, at most, a few dozen (and significantly less than 1%) of RARs—though the number of actual religious accommodation requests approved (*i.e.*, rather than administrative exemptions that are mischaracterized as religious accommodations) appears to be zero—while denying thousands. *See supra* ¶¶ 45-46. These statistics demonstrate that (1) submissions of religious accommodation requests are futile and (2) that the DOD and Coast guard are systematically denying these requests, in violation of their statutory obligations and the constitutional rights of Plaintiffs. Plaintiffs note that the Air Force and Marine Corps purport to have granted a handful of requests and appeals, however, these RARs appear to have been granted to those on terminal leave or conditioned upon their separation from the military. *See Navy SEAL 1*, 2022 WL 534459, at *19 (Marine Corps approvals); *Poffenbarger*, 2021 WL 594810, at *13 n.6 (Air Force approvals). Thus, even the exceptions to the general policy of denying them all demonstrate that the process is a sham because the result is that no service member will be granted any accommodation and allowed to continue their service.

## VI.   PLAINTIFFS   WILL   SUFFER   CONCRETE   AND   PARTICULARIZED   HARM   FROM   DEFENDANTS' ACTIONS

95.   Plaintiffs have real, substantial, and legitimate concerns about taking experimental COVID-19 treatments in light of, and the potential for, short- and long-term side effects and adverse reactions.

96.   **Involuntary Separation & Forced Retirement.** Each Plaintiff has suffered severe adverse employment, administrative, and disciplinary actions. Plaintiffs are in the process of involuntary separation, forced retirement (or constructive discharge), or dismissal and will soon face a Board of Inquiry or Administrative Separation Board to determine their discharge status, or other disciplinary proceedings.

97.   **Removal from Senior or Leadership Positions.** Due to their vaccination status and/or vaccination status, some Plaintiffs have been relieved of senior or leadership positions or denied promotion. *See* Ex. 5, Decl. of LT Caleb Wadsworth, USCG.

98.   **Duty, Promotion & PCS Restrictions.** Plaintiffs are restricted from travel, training to maintain qualifications for their current positions, qualifying for promotion, taking new assignments and permanent change of station ("PCS") (*i.e.*, moving to new duty stations). Some are being subjected to the proverbial administrative "soft kill" by removing them from operational/deploying commands/units or

43

promotion to the next grade. While it has been determined the court cannot tell the Navy or DOD who is or is not deployable, the actions taking place remain punitive to the Plaintiffs as these are milestone billets in their careers that must be completed in order to be competitive in advancement and selection boards. Defendants have yet to provide a plan of action to prevent such negative actions against the servicemembers who have refused the unlawful orders and are to be protected under the class action injunction of *Navy SEALs 1-26*.

99. **Letters of Reprimand or Counseling.** Plaintiffs have received one or more letters of reprimand, or other paperwork that will adversely affect their discharge status, and due to their vaccination status

100. **Loss of Pay and Benefits.** Plaintiffs will also face substantial financial losses in terms of lost pay and benefits due to separation, dismissal and early retirement.

101. **Adverse Actions for Refusal to Take EUA Vaccines.** Further, Plaintiffs have objected to the mandate based on the unavailability of any FDA-licensed vaccines, the subsequent requirement to take a non-FDA-licensed EUA vaccines, and/or the fraudulent misrepresentation of non-FDA-licensed EUA vaccines as FDA-licensed vaccines. As a result, they received disciplinary action as

precursor to involuntary separation for their refusal to take a non-FDA-licensed vaccine. In addition, the Coast Guard has mandated weekly testing for certain Plaintiffs, without regard to health status or symptoms and in contradiction to the CDC recommendation that tests should only be used once symptoms are present.

102.   Defendants have a long history of ignoring and violating service members' informed consent rights as they seek to do here, and it is the role of federal courts to protect service members' rights just as the protect ours: "the United States cannot demand that members of the armed forces also serve as guinea pigs for experimental drugs." *John Doe #1 v. Rumsfeld*, 297 F.Supp.2d 119, 135 (D.D.C. 2003) ("*Rumsfeld I*"). The injury is exacerbated by the fact that the government not only seeks to deprive them of their informed consent rights, both through deception and coercion, but also to take their freedom and livelihoods for having the temerity to exercise the rights granted to them by statute and the U.S. Constitution and courage to fulfill their duty to disobey unlawful orders.

## VII.   CLASS ACTION ALLEGATIONS

103.   Plaintiffs bring this action on their own behalf and as a class action as representative parties on behalf of all members of the class and subclasses defined herein under the provisions of Federal Rules of Civil

Procedure (the Rules) 23(a) and 23(b). Plaintiffs seek declaratory and injunctive relief, and relief incident to and subordinate to it, including costs and attorney fees.  A class action is appropriate because, as shown below: (a) the class is so numerous that joinder of all members is impracticable, (b) there are questions of law and fact common to the class, (c) the claims of the Plaintiffs are typical of the claims of the class, and (d) the representative parties will fairly and adequately protect the interests of the class.

104.  **Definition of the Class**.  The class represented by Plaintiffs in this action, and of which Plaintiffs are themselves members, consists of active duty and Reserve Coast Guard Members who are (1) subject to the DOD Mandate and the Coast Guard Mandate; and (2) who have requested religious accommodation or medical exemption from the DOD and Coast Guard Mandates.

105.  **Natural Immunity Sub-Class.**  Plaintiffs also include the sub-class of Coast Guard members are those who have had COVID yet been denied exemption from receiving the vaccine because of natural immunity, a decision contrary to the DoD policy expressed in all Services' vaccine regulations, AR 40-562, as well as the weight of scientific evidence. Numerous studies have shown that taking the new vaccine after having COVID increases the risk of dangerous side effects and

lowers immunity to the disease.

**Plaintiffs Satisfy FRCP Rule 23(a)**

106. **Definition of the Class**. The class represented by Plaintiffs in this action, and **Numerosity**. The exact number of the class and subclasses identified above is not known at this time, but the Defendants have that information. There are over 120 named Plaintiffs, and Plaintiffs estimate that there are thousands of class members. The class is so numerous that joinder of individual members in this action is impractical.

107. **Commonality.** There are common questions of law and fact involved in this action that affect the rights of each member of the class and the relief sought is common to the entire class. The specific claims of Plaintiffs and similarly situated Coast Guard class members are detailed below in the First through Fifth Causes of Action.

108. **Plaintiffs' Claims Are Typical of the Proposed Classes.** The claims of the Plaintiffs, who are representatives of the class, are typical of the claims of the class in that the claims of all members of the class, including Plaintiffs, depend on a showing of the Defendants' acts and omissions giving rise to the Plaintiffs' right to the relief sought. There is no conflict between any individual named Plaintiff and other members of the class with respect to this action, or with respect to the

claims for relief set forth in this complaint.  The class has similar injuries flowing from the Defendants' unlawful and unconstitutional actions.

109.   The named Plaintiffs are the representative parties for the class, are able to and will, fairly and adequately protect the interests of the class. The Plaintiffs' declarations in show they adequately represent the various statuses of the class, *i.e.*, all Services, active, reserve, National Guard.  The attorneys for Plaintiffs actively conduct and be responsible for Plaintiffs' case. The lead attorney, Dale Saran, is an experienced class action attorney.  The named Plaintiffs and their undersigned counsel will fairly and adequately protect the interests of the class.

**Plaintiffs Satisfy FRCP Rule 23(b)(1) and 23(b)(2)**

110.   **Definition of the Class**.  The class represented by Plaintiffs in this action, and This class action is maintainable under Fed. Rule of Civil Procedure (the "Rules") 23(b) because it satisfies the prerequisites of Rule 23(a) and the following conditions of Rule 23(b):

(1) the prosecution of separate actions by individual members of the class would create a risk of :

(A) inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the Defendants, all of whom oppose the class; or

(B) adjudications with respect to individual members of the class which would, as a practical matter, be dispositive

of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and/or

(2) the party opposing the class has acted and refused to act on grounds generally applicable to the class, as more specifically alleged below, on grounds which are generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole which this action seeks.

111.   The findings required by Rule 23(b)(1) and (2) are supported by the fact there is a large class of chaplains against whom the Secretary and the Armed Forces have operated in a systematic discriminatory manner violating the Constitution, federal statutes, and the Defendants' own regulations. The declaratory and injunctive relief sought will affect all persons who have experienced the alleged retaliation discrimination. Furthermore, the constitutional and federal questions Plaintiffs raise dominate this action and apply to all members of the class.  If Plaintiffs are successful, any individual relief that is incidental to this action will be determined by statute and require little if any involvement by the Court.  Additional considerations that support certification under 23(b)(1) and/or 23(b)(2) include:

a.   Inconsistent or varying adjudications with respect to individual class members could subject Defendants to incompatible standards of conduct;

b.    The Court's adjudication of the claims raised herein on behalf of the Named Plaintiffs alone would, as a practical matter, be dispositive of the interests of the other members not party to such individual adjudications and could leave those other members without the ability to protect their own interests;

c.    The Defendants have acted or refused to act on grounds that apply generally to all members of the proposed Classes such that final injunctive or declaratory relief would be appropriate respecting each of the proposed Classes; and finally,

d.    The issues here are primarily constitutional and statutory which involve no exercise of military discretion or expertise

### FIRST CAUSE OF ACTION
### VIOLATION OF RELIGIOUS FREEDOM RESTORATION ACT
### 42 U.S.C. § 2000bbb, *et seq.*

112.   Plaintiffs reallege, as if fully set forth in this Count, the facts in Paragraphs 10-20, Section I (¶¶ 28-38), Section II (¶¶ 39-46), Section IV (¶¶ 61-64), Section V (¶¶ 66-78), Section VI (¶¶ 88-96), and Section VII(¶¶ 97-105).

113.   RFRA was enacted "in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014) ("*Burwell*"). "Congress mandated that this concept be

'construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Burwell*, 134 S. Ct. at 2762 (*quoting* 42 U.S.C. § 2000cc-3(g)).

114.   RFRA states that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). The government burdens religion when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981), or "prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief." *Davila v. Gladden*, 777 F.3d 1198, 1204 (11th Cir. 2015) (citation and quotation omitted). "That is especially true when the government imposes a choice between one's job and one's religious belief," *Navy SEALs 1-26*, at *9 (*citing Sherbert v. Verner*, 374 U.S. 398 (1963)).

115.   If the Government substantially burdens a person's exercise of religion, it can do so only if it "demonstrates that application of the burden ***to the person*** – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b)

(emphasis added). This means that strict scrutiny must be satisfied both for the "the asserted harm of granting specific exemption to particular religious claimants," and of "the marginal interest in enforcing the challenged government action in that particular context." *Burwell*, 573 U.S. at 726-27. *See also O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 430 (2006) ("*O Centro*") (the Government must "demonstrate that the compelling interest is satisfied through the application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened").

116.   "RFRA expressly creates a remedy in district court," *Navy SEAL 1*, 2022 WL 534459, at *13, granting a "person whose religious exercise has been burdened in violation of" RFRA to "assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the government." 42 U.S.C. § 2000bb-1(c).

117.   RFRA applies to Defendants, as they constitute a "branch, department, agency, instrumentality, and official of the United States." 42 U.S.C. § 2000bb-2(1). Further, "RFRA includes no administrative exhaustion requirement and imposes no jurisdictional threshold. No exemption, whether … express or implied, insulates the military from review in the district court." *Navy SEAL 1*, at *13.

118. Defendants have substantially burdened Plaintiffs' free exercise rights because the mandate forces Plaintiffs to "decide whether to lose their livelihoods or violate sincerely held religious beliefs." *Navy SEALs 1-26*, at \*9. "By pitting their consciences against their livelihoods, the vaccine requirements would crush Plaintiffs' free exercise of religion." *Navy SEALs 1-26* Stay Order, 2022 WL 594375, at \*9.

119. Defendants' religious exemption regulation, and implementation thereof, is neither neutral nor generally applicable because it treats comparable secular activity—medical and administrative exemptions—more favorably than religious exemptions. While the Coast Guard does not publish up-to-date statistics, they have not granted a single one of 122 Plaintiffs' RARs, and the statistics available indicate that Defendants have refused to grant any religious accommodations for those who will continue to serve. *See supra* ¶¶ 45-46 & Table 1.

120. Plaintiffs have presented *prima facie*—and undisputable—evidence that Defendants have substantially burdened their exercise of religion, which triggers strict scrutiny where the government bears the burden of proving that its policies satisfy strict scrutiny. *O Centro*, 546 U.S. at 429. "Because the mandate treats those with secular exemptions more favorably than those seeking religious exemptions, strict scrutiny

is triggered." *Navy SEALs 1-26*, at *9. RFRA thus presents a "high bar" to justify substantially burdening free exercise, and "[t]his already high bar is raised even higher [w]here a regulation already provides an exception from the law for a particular group." *Navy SEALs 1-26* Stay Order, at *10 (citations and internal quotations omitted). Defendants fail to meet this high bar for either of the two prongs of the strict scrutiny analysis.

121. While "[s]temming the spread of COVID-19 is unquestionably a compelling interest," *Cuomo*, 141 S. Ct. at 67, "its limits are finite." *Navy SEALs 1-26*, at *10. The government cannot rely on "broadly formulated interests," like "public health" or "military readiness," and must justify its decision by "scrutinize[ing] the asserted harm of granting specific exemptions to particular religious claimants." *Hobby Lobby*, 573 U.S. at 726-27.

122. Moreover, the actions taken against the unvaccinated bear no relation to the asserted goal. The unvaccinated with natural immunity are far less likely to transmit the virus, or to be reinfected, yet the Defendant's continue to ignore this and parrot demonstrably false data as the basis for ignoring the Plaintiffs' claims and rights.

123. Defendants' "broadly formulated interest in national security," *Navy SEALs 1-26*, at *10, will not suffice. Nor will simply

invoking "magic words" like "military readiness and health of the force." *Navy SEAL 1*, at \*17 (*quoting Davila*, 777 F.3d at 1206). Instead, Defendants must produce "record material demonstrating that the military considered both the marginal increase, if any, in the risk of contagion incurred by granting the requested exemption and the marginal detrimental effect, if any, on military readiness and the health of the force flowing from the … denial" of the specific Plaintiff's exemption request. *Navy SEAL 1*, at \*15.

124.   As in *Navy SEAL 1*, Defendants have manifestly failed to demonstrate that they have a compelling governmental interest in denying Plaintiffs' RARs and appeals. Instead, they have relied on "magic words" to "rubber stamp," *see Navy SEAL 1*, \*18, in their blanket denials of Plaintiffs' RAR and appeal denial letters, *see supra* ¶¶ 71-78 (summarizing formulaic and deficient analysis in Plaintiffs' RAR and appeal denial letters), just as they have tens of thousands of other service members.

125.   Nor have Defendants demonstrated that their blanket denials of Plaintiffs' religious exemptions are the least restrictive means of furthering that interest. These letters both ignore Defendants' own successful use of alternatives to vaccination over the past two years (*e.g.*, masking, testing, quarantine, social distancing), but also those proposed

by Plaintiffs that are specifically adapted to their specific role, unit, vessel, or mission and the evidence presented that these measures have enabled them to successfully perform their missions and roles without vaccination.

126.    More than 90 of the 127 Plaintiffs have documented previous COVID-19 infections from which they have fully recovered, in many cases, quite recently. Such natural immunity from previous infections provides stronger and longer-lasting protection than the vaccines. *See supra* ¶ 65.

127. Yet the Defendant's denial letters dismiss natural immunity—"reaching disputed medical conclusions without evaluation or citation of medical or legal authority," *Navy SEAL 1*, at *16 & n.10—combined with Plaintiffs' proposed less restrictive alternatives that have been successfully employed in the past without acknowledgement or discussion. *See id.* at *18-19. Just as in *Air Force Officer*, Defendants' conclusory assertions fail to show that "COVID-19 vaccine[s] … provide more sufficient protection" than Plaintiffs' "natural immunity coupled with other preventive measures," nor have they shown "vaccination is actually necessary by comparison to alternative measures, since the curtailment of free [exercise] must be actually necessary to the solution."

*Air Force Officer*, 2022 WL 468799, at *10 (citation and quotation omitted).

128.   Finally, Defendants cannot satisfy either prong of strict scrutiny—compelling government interest or least restrictive means—by mandating 100% vaccination with a vaccine that is known to be ineffective and obsolete. The government's strict scrutiny analysis is highly fact intensive, and the individualized assessment prescribed by *Burwell* and *Navy SEAL 1*, requires the government to perform a marginal cost vs. benefit analysis that takes into account the current costs and benefits from granting specific exemptions.

129.   Plaintiffs seek declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by Defendants' violation of their right under RFRA to the free exercise of religion.

## SECOND CAUSE OF ACTION
## VIOLATION OF FIRST AMENDMENT FREE EXERCISE CLAUSE
### U.S. CONST. AMEND. I

130.   Plaintiffs reallege, as if fully set forth in this Count, the facts in Paragraphs 10-20, Section I (¶¶ 28-38), Section II (¶¶ 39-46), Section IV (¶¶ 61-64), Section V (¶¶ 66-78), Section VI (¶¶ 88-95), and Section VII(¶¶ 96-105).

131.   The First Amendment's Free Exercise Clause provides that

"Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. CONST. AMEND. I.

132.   "Government is not free to disregard the First Amendment in times of crisis." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 69 (2020) ("*Cuomo*") (Gorsuch, J., concurring). "Even in a pandemic, the Constitution cannot be put away and forgotten." *Cuomo*, 141 S. Ct. at 68 (per curiam). Just as "[t]here is no COVID-19 exception to the First Amendment," there is "no military exclusion from our Constitution." *Navy SEALs 1-26*, at *1.

133.   Governmental regulations that are not neutral or generally applicable "trigger strict scrutiny" when "they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original) (*citing Cuomo*, 141 S. Ct. at 67-68). "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1877 (2021).

134.   Plaintiffs submitted religious exemption requests, stating that their religious beliefs prohibited them from receiving the available COVID-19 vaccines because of their sincerely held religious beliefs that, among other things, abortion is an abomination and because the aborted

fetal cells were critical to the development of the vaccines, they refuse to participate or support this evil.

135.   Defendants have denied the RAR of each Plaintiff, and the RAR appeal of all but one. In issuing these denials, Defendants unlawfully denied Plaintiffs' requests for accommodation of their sincerely held religious beliefs.

136.   Defendants' No Accommodation Policy is neither neutral nor generally applicable because they "single out … for harsh[er] treatment," *Cuomo*, 141 S. Ct. at 66, those who choose to remain unvaccinated for religious reasons than those who seek to remain unvaccinated for secular reasons. The Navy's statistics on the number of exemptions granted speak for themselves, with thousands of medical and administrative exemptions granted, compared to a mere handful of religious accommodations for service members who will not remain in the service. "No matter how small the number of secular exemptions by comparison, *any* favorable treatment … defeats neutrality." *Navy SEALs 1-26*, at * 11 (emphasis in original).

137.   Having established that Defendants' policies are not neutral and substantially burden Plaintiffs' exercise of religion by treating those seeking exemption from vaccination based on sincerely held religious beliefs less favorably than those seeking exemption for secular reasons,

the burden of proof switches to Defendants who must demonstrate that their policies satisfy strict scrutiny, meaning that they must be (1) "narrowly tailored" (2) "to serve a compelling [government] interest." *Cuomo*, 141 S. Ct. at 67 (*citing Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)).

138.   Defendants' religious exemption policies fail to satisfy strict scrutiny under the First Amendment for largely the same reasons they fail strict scrutiny under RFRA. *See, e.g., Navy SEALs 1-26*, at *11; *Air Force Officer*, at * 11-12. The DOD Mandate, as a policy and as applied to Plaintiffs, fails to accommodate Plaintiffs' sincerely held religious beliefs. There is no interest, compelling or otherwise, for Defendants to deny Plaintiffs' religious exemptions or threaten not to accommodate Plaintiffs' sincerely held religious beliefs. Nor have Defendants chosen the least restrictive means of achieving any compelling governmental interest and, in fact, have dismissed and uniformly denied Plaintiffs' alternative, less restrictive mitigation measures. Accordingly, the DOD Mandate, and the Defendants' religious accommodation policies and procedures, cannot survive strict scrutiny.

139.   Plaintiffs seek declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by Defendants' violation of their First Amendment right to the free exercise

of religion.

## THIRD CAUSE OF ACTION
## VIOLATION OF FIFTH AMENDMENT DUE PROCESS CLAUSE
### U.S. CONST. AMEND. V

140.    Plaintiffs reallege, as if fully set forth in this Count, the facts in Paragraphs 10-20, Section I (¶¶ 28-38), Section II (¶¶ 39-46), Section IV (¶¶ 61-64), Section V (¶¶ 66-78), Section VI (¶¶ 88-95), and Section VII(¶¶ 96-105).

141.    **Substantive Due Process.** The military "vaccine" mandate violates the liberty protected by the Fifth Amendment to the Constitution, which includes rights of personal autonomy, self-determination, bodily integrity and the right to reject medical treatment.

142.    The ability to decide whether to accept or refuse medical treatment is a fundamental right. Accordingly, Defendants' "Vaccine" Mandate violates Plaintiffs' constitutional rights with regard to medical treatment.

143.    Because the injections are treatments, and not vaccines, strict scrutiny applies. The US Supreme Court has recognized a "general liberty interest in refusing medical treatment." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278, 110 S. Ct. 2841, 2851, 111 L.Ed.2d 224, 242 (1990). It has also recognized that the forcible injection of medication into a nonconsenting person's body represents a substantial interference with

that person's liberty. *Washington v. Harper*, 494 U.S. 210, 229, 110 S. Ct. 1028, 1041, 108 L.Ed.2d 178, 203 (1990), see also *id*. at 223 (further acknowledging in dicta that, outside of the prison context, the right to refuse treatment would be a "fundamental right" subject to strict scrutiny).[13]

144.   Because mandated medical treatments are a substantial burden, Defendants must prove that the Vaccine Mandate is narrowly tailored to meet a compelling interest. Where the government burdens a person's liberty interest in bodily integrity, the government must: (1) "adequately demonstrate a compelling need for the intrusion," (2) "a lack of reasonable alternatives," and (3) appropriate "procedural and medical safeguards." *Planned Parenthood Southwest Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012) (*discussing Riggins v. Nevada*, 504 U.S. 127, 135-36, 112 S.Ct. 1810 (1992)).

145.   No such compelling interest exists because, as alleged above, the injections are not effective against the now dominant Omicron variant of SARS-CoV-2 in that they do not prevent the recipient from

---

[13] Although *Cruzan* was decided under the due process clause of the Fourteenth Amendment, the Supreme Court has long held that the same substantive due process analysis applied to the states under the due process clause of the Fourteenth Amendment also applies to the federal government under the due process clause of the Fifth Amendment. *See, e.g., Bolling v. Sharpe,* 347 U.S. 497, 500 (1954).

becoming infected, getting reinfected, or transmitting SARS-CoV-2 to others. *See supra* ¶¶ 62.

146. By Defendant FDA's own standards, the current EUA shots only demonstrate that they *may* have been effective against the original SARS-CoV-2 Alpha variant, but that strain has come and gone, and the injections—designed to fight yesterday's threat—are simply "obsolete" against the current variant. *See* Ex. 20, McCullough Supp. Decl., ¶ 12.

147. Since the injections are ineffective against the currently prevalent Omicron variants and sub-variants, and the original variant has been supplanted, there can be no compelling interest to mandate their use.

148. Even if there were a compelling interest in mandating the injections, the Defendant DoD's mandate is not narrowly tailored to achieve such an interest.

149. Defendants also entirely disregard whether Plaintiffs have already obtained natural immunity despite the fact that natural immunity does actually provide immunity whereas the injections do not. All members of the Natural Immunity Sub-Class have a documented previous infection from which they have fully recovered, in most cases a quite recent infection by the Omicron variant, thus have stronger and more durable immunity from reinfection than they would acquire from

vaccination.

150.   Treating all servicemembers the same, regardless of their individual medical status, risk factors, and natural immunity status is not narrowly tailored.

151.   Moreover, the Vaccine Mandate fails entirely to consider other existing treatment options beyond the injections as part of a more narrowly tailored approach.

152.   Given these facts, the Vaccine Mandate has no real or substantial relation to Force Protection and is, instead, a public health policy backed by force, turning the entire program into a plain, palpable invasion of rights secured by the fundamental law.

## FOURTH CAUSE OF ACTION
## VIOLATION OF FIFTH AMENDMENT DUE PROCESS CLAUSE
### U.S. CONST. AMEND. V

153.   Plaintiffs reallege, as if fully set forth in this Count, the facts in Paragraphs 10-20, Section I (¶¶ 28-38), Section II (¶¶ 39-46), Section IV (¶¶ 61-64), Section V (¶¶ 66-78), and Section VI (¶¶ 88-95).

154.   **Procedural Due Process.** The DOD Mandate requires Plaintiffs to take a vaccine without their consent and threatens to deprive Plaintiffs of constitutionally protected life, liberty and property interests without due process of law.

155.   The DOD Mandate "threatens to substantially burden the

liberty interests" of Plaintiffs "put to a choice between their job(s) and their jab(s)." *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("*OSHA*"). Plaintiffs face not only the loss of the current employment, but also will be barred from other federal or private employment due to their vaccination and discharge status. The DOD Mandate, and its treatment of religious accommodation requests, also burdens other fundamental rights—in particular, the free exercise of religion protected by the First Amendment. *See id.*, at *8 n.21 (citations omitted).

156.   The Defendants' policy of systematic and uniform denial of 100% of RARs is just as much a deprivation of their Fifth Amendment Due Process rights, U.S. CONST. AMEND. V, as it is of First Amendment Free Exercise rights. Due process requires not only notice and an opportunity to be heard, but also an impartial decisionmaker where, unlike here, the outcome is not "predetermined." *See, e.g., McCarthy v. Madigan,* 503 U.S. 140, 148 (1992). The zero or near zero approval rate shows that the Navy has "predetermined the denial of the religious accommodations." *Navy SEALs 1-26*, at *6. This is no accident, but the intended result of a process designed to deny Plaintiffs' free exercise rights; their fate has been sealed before the process begins.

157.   Vaccine refusal may also result in deprivation of protected

property interests. Disciplinary action or discharge status may cause Plaintiffs to lose retirement, veterans, and other governmental benefits to which they are entitled. Loss of pay and benefits amount to hundreds of thousands or even millions of dollars in many cases. *See supra* ¶ 93 (summarizing estimated lost pay and benefits).

158.   As a result of the Defendants' unlawful and unconstitutional actions, Plaintiffs face deprivation of their rights to life, liberty and property without due process or fair notice. Plaintiffs seek declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by Defendants' violation of their Fifth Amendment rights to due process.

## FIFTH CAUSE OF ACTION
### VIOLATIONS OF INFORMED CONSENT LAWS & PHSA
### 10 .S.C. § 1107a, 21 U.S.C. 360bbb-3 & 42 U.S.C. § 262

159.   Plaintiffs reallege, as if fully set forth in this Count, the facts in Paragraphs 10-20, Section I (¶¶ 28-38), Section III (¶¶ 47-60), Section IV (¶¶ 61-64), Section VI (¶¶ 88-96), and Section VII(¶¶ 97-101).

160.   The DOD Mandate states that only FDA-licensed vaccines, labeled in accordance with FDA requirements, are mandated. *See supra* Ex. 6, DOD Mandate, at 1. However, due to the fact that such vaccines were not available to Defendants, Defendants instead have ordered Plaintiffs and all other service members to receive unlicensed, EUA

vaccines "as if" they were FDA-licensed vaccines. *See supra* Sections I.B & I.C.

161. The Informed Consent Laws expressly prohibit the mandatory administration of EUA products, whether to service members or anyone else. *See* 10 U.S.C. § 1107a and 21 U.S.C. § 360bbb-3. The statutory informed consent rights are expressly stated in the fact sheet that the FDA requires to be included in every package of EUA vaccines, confirming that the recipient has the "option to accept or refuse" the EUA product. *See supra* ¶ 49, Pfizer/BioNTech Fact Sheet, at 14.

162. The DoD Mandate and the Coast Guard Mandate violate these Informed Consent Laws to the extent that the DoD and/or the Coast Guard have mandated the unlicensed EUA Pfizer/BioNTech or Moderna vaccines, and/or direct DoD healthcare providers or military treatment facilities to administer the unlicensed EUA vaccine pursuant to the DoD Mandate. While the DoD Mandate itself states that only FDA-licensed vaccines may be mandated, *see* Ex. 6, DOD Mandate, at 1, Defendants DoD and Coast Guard are in fact mandating EUA vaccines. *See Austin*, 2021 WL 5816632, at *5.

163. The DoD and the Coast Guard are departments and agencies of the United States Government. As such, they are agencies created by statute, and "it is axiomatic that an administrative agency's power to

promulgate legislative regulations," like the DoD Mandate, "is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S. Ct. 468, L.Ed.2d 493 (1988); *see also La. Pub. Serv. Comm'n v. FERC*, 476 U.S. 355, 375, 106 S. Ct. 1890, 90 L.Ed.2d 369 (1986) ("an agency literally has no power to act, …, unless and until Congress confers power on it.").

164. While Congress and the President have delegated broad authority to the DoD and the Secretary of Defense in military matters, in 10 U.S.C. § 1107a they expressly prohibited Secretary Austin from issuing the order at issue here mandating the administration of an EUA product, without the express Presidential authorization that Secretary Austin has neither requested nor received. Accordingly, the DoD Mandate and the Navy Mandate implementation of it are "in excess of statutory jurisdiction [and] authority." 5 U.S.C. § 706(2)(C).

165. The Informed Consent Laws do not provide a private right of action. Accordingly, Plaintiffs' claims for Defendants' *ultra vires* actions in excess of their statutory authority, and in violation of Plaintiff's rights under the Informed Consent Laws, are brought under the APA. *See, e.g., Austin*, 2021 WL 5816632, at *2 & *7 n.12 (violations of Informed Consent Laws are "APA claims"). It is well-settled that, where a statute does not expressly provide a cause of action, plaintiffs

may enforce agency violations of the statute's substantive requirements through the judicial review provisions of the APA. *See, e.g., Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.,* 112 F.3d 1283, 1286 (5th Cir. 1997).

166.   It is further undisputed that the Pfizer/BioNTech and Moderna EUA COVID-19 vaccines are "legally distinct" from the licensed vaccines, Comirnaty and Spikevax. The EUA COVID-19 vaccines are subject to the laws governing EUA products, including the right to informed consent and to refuse mandatory administration, while Comirnaty and Spikevax are subject to the heightened safety and efficacy requirements governing FDA-licensed products, as well as the PHSA and FDA's requirements governing manufacturing and labeling of licensed products. Defendants have directed that all EUA-labeled COVID-19 vaccines by Pfizer/BioNTech or Moderna are legally interchangeable with these manufacturers' FDA-licensed vaccines (*i.e.*, Comirnaty and Spikevax), such that all EUA-labeled vaccines may be mandated. This directive erases the "legal[] distinct[ions] acknowledged by the FDA, and treats the FDA's determination that they are "medically interchangeable" as if the FDA has made a "statutory interchangeability determination," despite the fact that the FDA has expressly disclaimed having done so. *See supra* ¶ 58 (*discussing* Ex. 17, Marks Decl., ¶¶ 10-

11).

167.    In other legal challenges to the DOD Mandate, Defendants'
counsel has asserted the affirmative defense that the DoD Mandate, and
the scope of interchangeability, is limited to EUA-labeled, "BLA-
compliant" vaccines (*i.e.*, vaccines manufactured in accordance with the
Comirnaty BLA). *See generally Austin*, 2021 WL 5616632, at *5-6. But
the DoD Mandate and the Navy orders never use the terms "BLA-
compliant," or suggest any such limitation, and the publicly available
documents assert that any and all EUA-labeled vaccines are legally
interchangeable with the licensed vaccines, without any limitation to
"BLA-compliant" lots. The purported limitation of the mandate to "BLA-
compliant" lots was announced in the first instance by agency defense
counsel in court filings and is entirely unsupported in the record. Courts
may not accept "counsel's *post hoc* rationalization" as prime authority
"for agency action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm
Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983) ("*State Farm*"); *see also Univ.
of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir.
2021) ("*Post hoc* rationalizations offered by the Government's counsel are
irrelevant.").

168.    Moreover, the DoD administrative records submitted and
other filings in the *Coker* proceeding, which will be submitted separately

in this proceeding, confirm that: (1) all references to interchangeability in the record indicate that ***all*** unlicensed EUA-labeled COVID-19 vaccines (*i.e.*, without limitation to EUA-labeled, BLA-compliant lots) are deemed to be interchangeable with the licensed version; and (2) that there is no discussion of interchangeability with respect to "BLA-compliant" lots, nor is there any policy, directive, or guidance limiting the DoD Mandate to EUA-labeled, "BLA-compliant" lots. *See also Austin*, 2021 WL 5616632, at *6 ("the DoD concedes that … its current [EUA-labeled] vials are not BLA-compliant, and that there is no policy to ensure that servicemembers get only BLA-compliant vaccines."). Accordingly, Defendants are barred by the "record rule" from asserting any defense for which there is no support in the record and that was asserted only by agency defense counsel.

169.  As a result of Defendants' unlawful actions, Plaintiffs are required either to take an unlicensed, EUA vaccine or else face the serious disciplinary consequences outlined above that will result in the loss of his or her livelihood, veterans and other governmental benefits, and fundamental rights. The DoD Mandate and the Coast Guard Mandate must therefore be declared unlawful, and enjoined or vacated, to the extent they require the mandatory administration of an EUA COVID-19 vaccine. *See generally John Doe #1 v Rumsfeld*, 341 F. Supp.

2d 1 (D.D.C. 2004) ("*Rumsfeld I*"), *modified sub nom.* 2005 WL 774857

(D.D.C. 2005) ("*Rumsfeld II*") (expanding injunction against mandated

EUA anthrax vaccine).

## SIXTH CAUSE OF ACTION
## VIOLATIONS OF ADMINISTRATIVE PROCEDURE ACT
### 5 U.S.C. § 706(2)(A), § 706(2)(C) & § 706(2)(E)

170.    Plaintiffs reallege, as if fully set forth in this Count, the facts

in Paragraphs 10-20, Section I (¶¶ 28-38), Section III (¶¶ 47-60), Section

IV (¶¶ 61-64), Section VI (¶¶ 88-96), and Section VII(¶¶ 97-105).

171.    The DoD Mandate and the Coast Guard Mandate must be

set aside as "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(A). The entirety of the DOD

Mandate is a two-page memorandum from the Secretary of Defense that

cites no statute, regulation, executive order or other legal authority. The

DoD Mandate is arbitrary and capricious insofar as it imposes an

entirely new mandate on over two million active duty and reserve service

members without any explanation, justification, legal basis or authority;

any findings of facts or analysis (cost-benefit or otherwise) supporting

the directive; any meaningful consideration of alternatives to 100%

vaccination; any acknowledgement or explanation for the elimination of

the currently and pre-existing exemptions for service members who have

recovered from a previous documented infection; or any consideration of

the heightened risks and lack of any compensating benefits of vaccination for service members with documented previous infections.

172.   The DOD Mandate and Armed Services' guidance are *ultra vires* actions "in excess of statutory jurisdiction [and] authority," 5 U.S.C. § 706(2)(C), for the reasons set forth under the Fourth Cause of Action above. The DOD and the Armed Services are departments and agencies of the United States Government. As such, they are agencies created by statute, and "it is axiomatic that an administrative agency's power to promulgate legislative regulations," like the DOD Mandate, "is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S. Ct. 468, L.Ed.2d 493 (1988); *see also La. Pub. Serv. Comm'n v. FERC*, 476 U.S. 355, 375, 106 S. Ct. 1890, 90 L.Ed.2d 369 (1986) ("an agency literally has no power to act, ..., unless and until Congress confers power on it."). While Congress and the President have delegated the Secretary of Defense broad authority, they have expressly withheld the authority to mandate an EUA vaccine without Presidential waiver, which Secretary Austin has neither received nor requested.

173.   The DOD Mandate is arbitrary and capricious insofar as its sole justification or explanation is a conclusory statement that the Secretary has "determined that mandatory vaccination against [COVID-

19] is necessary to protect the Force and defend the American people."
Ex. 6, DOD Mandate, at 1. Given that the DOD Mandate was issued on
the very next day after FDA Comirnaty Approval, it is apparent the DoD
either blindly relied on the FDA approval and out-of-context FDA
statements regarding interchangeability or was fully involved in a
scheme to commit fraud upon members of the Armed Forces by denying
them their Constitutional and statutory rights and obviate the
Congressional requirements of 10 U.S.C §1107a.

174.   Defendants also purport to rely on the CDC's
recommendations in adopting the two-dose regimen, but have ignored
the CDC's unanimous recommendation that all eligible adults should
receive a third booster shot. *See* CDC, *CDC Expands Eligibility for
COVID-19 Booster Shots to All Adults,* CDC Media Statement (Nov. 19,
2021), available at: https://www.cdc.gov/media/releases/2021/s1119-
booster-shots.html. Such selective picking and choosing of which
recommendations to follow, without any explanation, is the essence of
arbitrary and capricious decision-making.

175.   The DOD Mandate is also arbitrary and capricious because
it constitutes an unannounced and unexplained departure from a prior
policy. As the Fifth Circuit recently noted in issuing a Preliminary
Injunction against the OSHA vaccine mandate:

> Because it is generally "arbitrary or capricious" to "depart from a prior policy *sub silentio*," agencies must typically provide a "detailed explanation" for contradicting a prior policy, particularly when the "prior policy has engendered serious reliance interests." OSHA's reversal here strains credulity, as does its pretextual basis. Such shortcomings are all hallmarks of unlawful agency actions.

*OSHA*, 17 F.4th at 614.

176.   The first vaccine that Defendant FDA ever granted EUA status to was the anthrax vaccine in 2005 – and it is directly relevant because in that prior case, both the Defendants DoD and FDA took the exact *opposite* legal position on the record than that which they are taking right now.

177.   After the D.C. District Court enjoined the Defendant DoD's anthrax vaccine program in 2003 in *Rumsfeld I*, the defendant DoD and FDA both took various actions to continue Secretary Cohen's 1998 anthrax vaccine mandate. After being enjoined again, and facing a permanent injunction, the Defendant DoD filed an emergency motion with that court to Modify the Injunction because Defendant FDA had reclassified the anthrax vaccine as an EUA product – the first time any vaccine had ever been granted that status:

> Defendants have now filed an Emergency Motion to Modify the Injunction, seeking clarification that there exists a third option - an alternative to informed consent or a Presidential waiver - by which defendants can administer AVA to service members even in the absence of FDA approval of the drug:

that is, pursuant to an Emergency Use Authorization
("EUA") under the Project BioShield Act of 2004, 21 U.S.C.A.
§ 360bbb-3.

*John Doe #1 v Rumsfeld*, 2005 WL 774857 (D.D.C. 2005) (enjoining

mandatory administration of EUA anthrax vaccine).

178.   The FDA placed several conditions on granting the EUA, but

only one is important to this litigation. Noting that 21 U.S.C. § 360bbb-

3(e)(1)(A)(ii)(III) contains not only an informed consent requirement, but

also a requirement that individuals to whom the product is administered

be informed of the option to accept or refuse administration of the

product, the FDA determined that an option to refuse vaccination meant

that DOD's AVIP could not be mandatory, and that there could

be no disciplinary or other punitive measures taken against service

members, civilian employees, or civilian contractors who refused the

shot.

> With respect to condition (3), above, relating to the option to
> accept or refuse administration of AVA, the AVIP will be
> revised to give personnel the option to refuse vaccination.
> Individuals who refuse anthrax vaccination will not be
> punished. Refusal may not be grounds for any disciplinary
> action under the Uniform Code of Military Justice. Refusal
> may not be grounds for any adverse personnel action. Nor
> would either military or civilian personnel be considered
> non-deployable or processed for separation based on refusal
> of anthrax vaccination. There may
> be no penalty or loss of entitlement for refusing anthrax
> vaccination.

70 Fed Reg. 5452, 5455 (Feb.2, 2005)(emphasis added).

179.    In other words, in circumstances identical to those presented here—and contemporaneously with the enactment of the 10 U.S.C. § 1107a—the FDA determined that the statutory requirement of an option to refuse a mandatory EUA vaccination meant that there can be no punitive action against someone who does not want the shot. This requirement applied to both military members and civilian employees and contractors, all of whom were subject to the anthrax vaccination program in its original form.

180.    Additionally, in a July 6, 2021 memorandum from the Office Legal Counsel, the DOD interpreted the informed consent requirements in 10 U.S.C. § 1107a "to mean that DOD may not require service members to take an EUA [vaccine]" without first obtaining a Presidential Waiver under 10 U.S.C. § 1107a.[14] There has been no Presidential Waiver, yet the Defendants are mandating use of EUA vaccines. "[A]gencies must typically provide a 'detailed explanation' for contradicting a prior policy;" they may not, as DOD has done here, "depart from a prior policy *sub silentio*." *OSHA*, 17 F.4th at 614 (*quoting FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S. Ct. 1800

---

[14] *See* <u>Exhibit 39</u>, Office of Legal Counsel, Vaccine Mandate Opinion, at 16.

(2009)).

181. The DoD administrative record provides further confirmation that Defendants acted arbitrarily and capriciously in enacting the mandate because Defendants failed altogether to consider any alternatives to 100% vaccination, including measures that had been effectively employed over the previous 18 months prior to the mandate (*e.g.,* masking, social distancing, testing, quarantine, etc.). Nor did Defendants provide any explanation in the record as to why these alternatives were inadequate or consider the relative costs and benefits of alternative measures. This is confirmed by the findings of the five U.S. district courts in the RFRA context that the DOD and other Armed Services failed to consider any alternative less restrictive measures. *See, e.g., Navy SEAL 1*, 2022 WL 534459, at *18; *Air Force Officer v. Austin*, 2022 WL 468799, *10 (M.D. Ga. Feb. 15, 2022) ("*Air Force Officer*"). Where an agency like DOD "provide[d] little or no explanation for the [its] choices," "omit[s] explanation for rejecting alternatives," and did "not address alternative (or supplementary) requirements," its order is arbitrary and capricious and must be vacated. *Health Freedom Def. Fund v. Biden*, 2022 WL 1134138, at *18-19 (M.D. Fla. Apr. 18, 2022).

182. Finally, the DOD Mandate and Armed Services Guidance are arbitrary and capricious, and unsupported by substantial evidence,

insofar as they categorically eliminated existing exemptions for previous documented infections under AR 40-562, or to consider natural immunity in its religious exemption decisions. *See, e.g., Navy SEAL 1*, at *16 & n.10; *Navy SEALs 1-26*, at *10; *Air Force Officer*, at *10. In doing so, Defendants have "entirely failed to consider an important aspect of the problem." *State Farm,* 463 U.S. at 43.

183.   As a result of the Defendants' unlawful actions, the Plaintiffs have suffered damages, including being required to take an unlicensed drug of unknown long-term safety profile; being subject to or threatened with disciplinary action under the Uniform Code of Military Justice (UCMJ), and including adverse administrative action that would discharge the Plaintiffs for "misconduct" and characterize their voluntary service as "other than honorable."

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs respectfully ask this Court to:

A.   Declare the DoD Mandate and the Coast Guard Mandate to be unlawful and unconstitutional and to vacate these orders;

B.   Declare that the Defendants' No Accommodation Policy violates services members' rights under RFRA, the First Amendment Free Exercise Clause, and the Fifth Amendment Due Process Clause;

C.   Enjoin the implementation or enforcement of the DOD Mandate and the Coast Guard Mandate by the Defendants with respect to the Plaintiffs and similarly situated Coast Guard members; and

D.    Enjoin any adverse or retaliatory action against the Plaintiffs as a result of, arising from, or in conjunction with the Plaintiffs' RAR requests or denials, or for pursuing this action, or any other action for relief from Defendants' constitutional, statutory, or regulatory violations.

E.    Award plaintiffs' costs and attorneys' fees and any other relief this Court may find appropriate.

Dated:  July 25, 2022

Respectfully submitted,

/s/ *Travis Miller*
Travis Miller, Esq.
Texas Bar #24072952
SDTX Federal ID No. 1708834
Defending the Republic.
2911 Turtle Creek Blvd.,
Suite 300 Dallas, TX 75219
Email: twm@defendingtherepublic.org

/s/ *Brandon Johnson*
Brandon Johnson, Esq.
DC Bar No. 491370
Defending the Republic
2911 Turtle Creek Blvd.,
Suite 300 Dallas, TX 75219
Tel. 214-707-1775
Email: bcj@defendingtherepublic.org
(PHV Motion Pending)

/s/ *Dale Saran*
Dale Saran, Esq.
MA Bar #654781
19744 W 116th Terrace
Olathe, KS 66061
Telephone: 480-466-0369
Email: dalesaran@gmail.com

(PHV Motion Pending)

/s/ *Simon Peter Serrano*
S. Peter Serrano, Esq.
WA Bar #54769
5238 Outlet Dr.
Pasco, WA 99301
Telephone: 530-906-9666
Email: pete@silentmajorityfoundation.org
(PHV Motion Pending)

Attorneys for the Plaintiffs