# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| **MICHAEL BAZZREA, et al.,** ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | CA No. 3:22-cv-00265 |
| ) | |
| **ALEJANDRO MAYORKAS, et al.,** ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

### DECLARATION OF REAR ADMIRAL ERIC C. JONES

I, REAR ADMIRAL ERIC C. JONES, hereby declare and state:

1. I am a commissioned officer serving on active duty in the United States Coast Guard. I have served in the Coast Guard for over thirty years. I am currently serving as the Deputy for Personnel Readiness, and I have served in this position since April 2022. Immediately prior to this assignment, I served as the Assistant Commandant for Human Resources. My prior assignments include a variety of assignments both afloat and ashore, including command afloat. I make this declaration in my official capacity, based upon my personal knowledge and upon information that has been provided to me in the course of my official duties.

2. As the Deputy for Personnel Readiness, I oversee the recruiting, development, and support of the highly capable and diverse workforce that enables Coast Guard mission success. In this capacity, I am responsible for supervising the human resources and force readiness training staffs to assure a mission-ready workforce of over 57,000 active duty, reserve, and civilian personnel.

*I. The COVID-19 Vaccine Mandate*

3. On August 24, 2021, the Secretary of Defense determined "that mandatory vaccination against coronavirus disease 2019 (COVID-19) is necessary to protect the Force and defend the

1

American people" and directed the "Secretaries of the Military Departments to immediately begin full vaccination of all members of the Armed Forces under DoD authority on active duty or in the Ready Reserve, including the National Guard, who are not fully vaccinated against COVID-19."[1] The military services have a joint policy with regard to immunizations to prevent infectious diseases—Army Regulation 40-562, which is also Coast Guard Commandant Instruction Manual 6230.4G. Consequently, the Coast Guard quickly also took steps to achieve full vaccination of its military members.

4. On August 26, 2021, the Coast Guard mandated all Coast Guard active duty and Ready Reserve members who were not fully vaccinated to receive the Pfizer-BioNTech COVID-19 vaccine, or to otherwise achieve full vaccination through any vaccine administered under the Food and Drug Administration's (FDA) Emergency Use Authorization (EUA), or a vaccine on the World Health Organization Emergency Use Listing.[2] The Coast Guard has issued supplemental guidance to this mandate in the months following the August 26, 2021, announcement.[3]

5. All Coast Guard commands were directed to counsel all unvaccinated Coast Guard military members regarding the requirement to get vaccinated, the timeline for vaccination, and the process to request medical exemption or religious accommodation.[4] Coast Guard commands were required to document this initial counseling through Administrative Remarks Form, CG-3307. Commands were further directed to document the process by which members who continued to

---

[1] Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members, 24 August 2021.
[2] COVID-19: Mandating COVID-19 Vaccination for Military Members, ALCOAST 305/21. In this directive, the Coast Guard noted that the "Pfizer-BioNTech COVID-19 was granted license by the Food and Drug Administration (FDA) on 23 Aug 2021." *Id.* ¶ 3.
[3] ALCOAST 315/21, ALCOAST 352/21, ALCGPSC 104/21, ALCOAST 420/21, ALCOAST 446/21, ALCGPSC 016/22, ALCOAST 078/22, ALCOAST 131/22, ALCOAST 157/22.
[4] ALCOAST 315/21. Members were directed to submit their religious accommodation requests no later than November 30, 2021. ALCOAST 420/21. If a member's medical exemption request or religious accommodation request is denied, members are directed to receive their first COVID-19 dose within ten (10) business days of notification of denial. ALCOAST 446/21.

refuse to vaccinate were ordered to a vaccine administration site at a particular date and time designated by the command, and any subsequent failure by the member to abide by this order. ALCOAST 352/21.

6. Subsequent guidance notified members of the consequences of failure to vaccinate without an approved medical exemption or religious accommodation request. Members who refuse to vaccinate are ineligible to execute permanent change of station orders. ALCGPSC 016/22. They are ineligible for Command, full-time Command Master Chief/Senior Chief, or Reserve Command Master Chief/Senior Chief positions, and members currently serving in these positions may be relieved for cause. ALCOAST 446/21. Additionally, members who refuse to vaccinate may be subject to additional measures necessary to mitigate health risks to other members and the public, including restrictions on official travel, liberty (i.e. off-duty hours), and leave, and cancellation of "A" and "C" school orders and advanced education programs.[5] ALCOAST 352/21; ALCOAST 157/22. Failure to obey a lawful order to vaccinate is also punishable under Article 92 of the Uniform Code of Military Justice (UCMJ) and may result in punitive or administrative action, including separation. ALCOAST 315/21.

7. Most recently, on July 22, 2022, the Coast Guard issued supplemental guidance beginning involuntary administrative separation processing for all non-compliant Active Duty service members, and initiating processing for involuntary transfer to the Inactive Status List (ISL) for all non-compliant Reserve members. ALCOAST 270/22.

8. Reassignment to the ISL is not a separation or discharge. A member on the ISL is still a member of the Coast Guard. The ISL includes former Active Duty and Reserve military personnel who, though not actively participating in the military, are still affiliated with the Reserve

---

[5] "A" and "C" school orders direct members to attend temporary rate/job-specific training.

3

Component. The ISL serves as a resource pool of Reserve members who, if they meet readiness standards, may be eligible to return to the Selected Reserve in a participating status. Reserve members routinely transfer to and from the ISL in order to manage commitments in their personal lives (e.g., following the birth of a child). Reserve members who are involuntary transferred to the ISL will be placed in a no pay/no points status. Placing a member in a no pay/no points status on the ISL means that the member will not be drilling with the member's unit and thus will not be earning pay for that work or credit toward retirement. Barring misconduct, individuals who are transferred to the ISL and who complete their military service obligation are honorably discharged.

## II. COVID-19 Exemption Request Processing

9. Members may seek exemption from the COVID-19 vaccination mandate. There are two types of exemptions from Coast Guard vaccination requirements: medical exemptions and administrative exemptions.

### a. Medical Exemptions

10. Medical exemptions to vaccination requirements are governed by Army Regulation (AR) 40-562, which is a consolidated military services regulation implemented by the Coast Guard through Commandant Instruction Manual 6230.4G (hereinafter "CIM 6230.4G"). A medical exemption includes any medical contraindication relevant to a specific vaccine or other medication. Medical personnel are responsible for reviewing and granting medical exemptions. CIM 6230.4G, 2-6. Health care providers will determine a medical exemption based on the health of the vaccine candidate and the nature of the immunization under consideration. CIM 6230.4G. Medical exemptions are revoked when they are no longer clinically warranted. *Id.*

11. All requests for medical exemptions are handled on a case-by-case basis. Healthcare providers consider the health of the candidate and the nature of the immunization under

consideration. In doing do, healthcare providers are directed to refer to detailed guidance regarding vaccine medical contraindications and precautions, as well as required screening and evaluation of recipients.[6]

12. First, a military physician counsels the requester. Through this counseling, the physician ensures that the member is making an informed decision by addressing specific information about the diseases concerned; specific vaccine information including product constituents, benefits, and risks; and potential risks of infection incurred by unimmunized individuals. The member's command then counsels the individual concerning how noncompliance with immunization requirements may adversely impact the member's deployability, assignment, or international travel.

13. Unless granted an exception, risk mitigation measures, including restrictions on official travel, liberty (i.e. off-duty hours), and leave, and cancellation of "A" and "C" school orders and advanced education programs, remain in place regardless of whether a member's request for medical exemption is pending or approved. ALCGPSC 104/21.

*i. Temporary Medical Exemptions*

14. The total number of temporary medical exemptions granted is not tracked. The present number is unknown because the amount of these active exemptions is constantly fluctuating, as they are related to a member's underlying health condition that is expected to resolve. Temporary medical exemptions to a COVID-19 vaccine have been granted, for example, to individuals who are actively ill with COVID-19 or another illness; pregnant individuals whose healthcare provider

---

[6] *See* ALCOAST COMDT Notice 089/21. This guidance includes CDC COVID-19 Vaccine Information Statements (VIS); FDA Emergency Use Authorization Fact Sheets for Healthcare Providers; CDC guidance on triage of people with a history of allergies or allergic reactions; and CDC ACIP Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States, including Ingredients included in COVID-19 vaccines.

determined that it was appropriate to defer vaccination until later in pregnancy or post-pregnancy; and members who were actively enrolled in COVID-19 clinical trials, if any.

15. Temporary exemptions could be granted for as little as a day or up to 365 days, depending on a number of factors, including anticipated changes in a patient's medical condition or the need for further evaluation at a future time. The duration of a temporary exemption necessarily varies based on the medical conditions and history of the patient at the time of evaluation. For example, an exemption granted related to a pregnancy could be in effect only for the duration of the pregnancy. A member who is actively enrolled in COVID-19 clinical trials may be exempt from vaccination until their participation in the trial is complete. Healthcare providers work closely with their patients to evaluate whether or not to extend or cancel a temporary medical exemption. If the underlying condition resolves and no longer necessitates temporary medical exemption, the member will be counseled regarding the timeline for initiating vaccination against COVID-19.

16. The approval authority for temporary medical exemptions from the COVID-19 vaccination directive is the local military-employed or affiliated Medical Officer. The medical officer's decision is memorialized in a memo provided to the requester, and a reconsideration process is available through the Operational Medicine Division of the Health, Safety, and Work-Life Service Center.

*ii. Permanent Medical Exemptions*

17. As of August 29, 2022, eight medical exemptions to the COVID-19 vaccine are permanent. The criteria for permanent exemption from COVID-19 vaccination are either severe allergic reaction (e.g., anaphylaxis) after a previous dose or to a component of the COVID-19 vaccine, or immediate allergic reaction of any severity to a previous dose, or diagnosed allergy to a component of the COVID-19 vaccine. ALCOAST COMDT Notice 089/21.

18. For permanent medical exemptions to any mandatory vaccine, including the COVID-19 vaccine, requests are routed through a local Medical Officer, to the Commandant, Operational Medicine and Quality Improvement Division (CG-1121), as final approval authority. This centralized approval authority for permanent medical exemptions to the vaccine requirements ensures uniformity in the adjudication of requests for exemption. ALCOAST COMDT Notice 089/21. The final decision is memorialized in a memo, which provides an explanation for the basis for the decision. No permanent medical exemptions have been revoked.

*b. Administrative Exemptions*

19. Consistent with the other military services, Coast Guard policy also provides for administrative exemptions to vaccination requirements for non-medical reasons. *See* Commandant Instruction Manual 6230.4G, 2-6. Non-medical personnel (sometimes with the assistance of advising medical personnel) are responsible for reviewing and granting administrative exemptions. CIM 6230.4G, 2-6.

20. The Coast Guard has granted only two types of administrative exemptions to the COVID-19 vaccine. First, the Coast Guard has granted an administrative exemption to the vaccination mandate for all members with an approved separation or retirement date no later than October 1, 2022. ALCOAST 078/22. Apart from the administrative exemption for members with an approved separation or retirement date no later than October 1, 2022, and the religious accommodation exemption mentioned below, no other types of administrative exemptions have been granted, nor are any other types contemplated.

*i. Religious Accommodation Requests*

21. Administrative exemptions also include requests to accommodate an individual service

member's religious beliefs. Requests for religious accommodation are processed on a case-by-case basis in accordance with Military Religious Accommodations, Commandant Instruction 1000.15, 11(c)(3) ("CI1000.15").

22. Given its overall size and interlocking missions, the Coast Guard has centralized its review of religious accommodation requests for immunizations to ensure consistency and to assess the impact of accommodations Coast Guard–wide. However, there is no single policy or practice of approving or denying religious accommodation requests, including with respect to the COVID-19 vaccine.

23. The review of requests for religious accommodation is a multi-step process that involves assessing the individual member's request, including the impact to operations, to the member's unit, and to the Coast Guard as a whole. Because cases are evaluated individually, a decision on a member's request, including any subsequent appeal of a denial, may take several days to several months.

24. Each request is individually reviewed with regard to the nature and sincerity of the religious belief, the extent to which the vaccine requirement burdens that belief, the impact of an accommodation on the Coast Guard's compelling need for a healthy military force capable of fulfilling its statutory missions, and whether there are less restrictive means available to the individual and their unit to meet that compelling interest.

25. Each religious accommodation request is necessarily different because each Coast Guard member's circumstances are unique. Accordingly, each request is reviewed in light of these particularized differences.

26. The Coast Guard manages six major operational mission programs—maritime law enforcement, maritime response, maritime prevention, marine transportation system

8

management, maritime security operations, and defense operations—and is charged with eleven statutory missions—marine safety, search and rescue, aids to navigation, living marine resources, marine environmental protection, ice operations, ports waterways, and coast security, drug interdiction, migrant interdiction, and law enforcement. Coast Guard members serve in assignments across these missions and across the globe, and they have a wide range of roles and responsibilities in these assignments. A particular member's location, occupational role, responsibilities, and duties vary. Their proximity to, and amount of time they must work with, other members of the Coast Guard, other military services, and with the public differ. Their ability to distance themselves from others and continue to perform the mission varies, as does the likelihood that they will be required to deploy on short notice to respond to an emergency. Nevertheless, all personnel must be available for unrestricted duty assignment worldwide.

27. Members aboard a cutter, for example, work in close proximity with other Coast Guard members and share berthing areas with only a few feet between their racks and hygiene facilities. Members of aircraft crews may work in smaller teams but in consistently enclosed spaces, in close proximity. Others in support roles may work in office environments where greater social distancing and other risk mitigation measures are possible to employ, whereas members serving in medical roles must have face-to-face contact with their patients. These particularized circumstances are considered in reviewing each individual religious accommodation request.

28. The Coast Guard has a compelling interest in maintaining a healthy, effective military workforce required for mission accomplishment at the individual, unit, and organizational level, including in maintaining military readiness, unit cohesion, good order and discipline, and health

and safety. To fulfill the eleven statutory missions, Coast Guard members are assigned across the United States and around globe. The Coast Guard's motto is "Semper Paratus": Always Ready. Its members perform these missions 24 hours a day, seven days a week and must be ready to deploy to respond to emergencies with little or no notice. Mandatory vaccination against COVID-19 is vital to ensuring the Coast Guard is able to achieve its statutory missions by ensuring the Coast Guard has a healthy, ready force.

29. A member initiates the process of seeking a religious accommodation by submitting a memorandum request through the member's Commanding Officer or Officer-in-Charge using an approved template found in Enclosure 2 of CI1000.15. The memorandum should describe the specific request the member is seeking, whether or not the member has previously had this or any other policy waiver request approved or denied, the religious beliefs on which the exemption request is based, how current policy prevents the member from practicing within their beliefs, and the relation to the sincerely-held belief on which the request is based. Although not required, some members have also included correspondence from clergy or other material to support their request.

30. After the request is submitted, a medical officer and a chaplain will meet individually with the requester. The medical officer must consult with the requester and provide specific information about the diseases concerned, specific vaccine information, and the potential risks for unimmunized individuals. *Id.* 12.h. The medical officer may document the counseling in a memo that includes the officer's opinion as to whether the member has the contraindication to receipt of the COVID-19 vaccines. The medical officer consult must be noted in the member's religious accommodation request memo.

31. A chaplain also interviews the member using the Religious Accommodation Interview Checklist found in Enclosure 3 of CI1000.15. The chaplain's interview can be very useful to

the various reviewers in understanding whether the request is actually based in a religious belief rather than a political, moral, or scientific belief. Some requests for religious accommodations may not actually stem from a religious belief, or may combine a religious belief with another rationale for departing from policy (*e.g.*, a requester might have a religious objection to an mRNA vaccine, but not to a vaccine that uses a weakened or inactivated vaccine to produce the immune response). In assessing the sincerity of the requester, the chaplain must not base his or her opinion on the chaplain's personal religious beliefs or interpretation of what constitutes an appropriate religious or other practice, but must focus instead on the importance of the request to the requester in terms of religious beliefs or principles, given the information provided. *Id.*

32. The chaplain then prepares a memorandum memorializing the interview using guidance provided in Enclosure 5 of CI1000.15. A copy of this memorandum is provided to the requester. Although there is no required template for the chaplain to use, Enclosure 5 of CI1000.15 provides a detailed list of questions the memorandum should address. The topics to be addressed include a description of the exception to policy being requested, including the nature of the religious or other practice and how it conflicts with applicable policy. The memo should explain whether or not policy completely prohibits the practice and whether or not the member has previously had this or any other accommodation request approved or denied. It should describe what the requester understands to be the underlying basis for the request and include a description of the religious beliefs on which the waiver request is based. It should also include how the requester expresses those beliefs or principles in daily life and what the requester lists as a religious preference. The chaplain will provide their professional opinion regarding the sincerity of the requester and opinion regarding the importance of the request to the requester.

33. Once these interviews are completed, the member's Commanding Officer or Officer-in-Charge reviews the request package, including any enclosures provided by the requester, and considers the religious objection of the member, the medical risk to the member and the unit, and the effect on Coast Guard readiness requirements, such as alert status, deployment potential, and availability of the member for reassignment to units requiring full medical readiness. The Commanding Officer or Officer-in-Charge is also encouraged to consult with their Servicing Legal Office. The Commanding Officer or Officer-in-Charge endorses the request either by signature with no comment or with a separate written endorsement. The endorsement may include a recommendation regarding whether or not to separate the member and may highlight any command concerns regarding staffing needs or other issues relevant to the unit. For example, a reserve unit could be scheduled to deploy in the near term which might significantly limit the unit's ability to mitigate risk by social distancing, may place the requester in an area with high community transmission, or may include country-specific vaccination requirements that preclude the member from traveling altogether.

34. The request package is then forwarded to Coast Guard Headquarters, where it is reviewed by the Office of Health Services, CG-112, and processed by the Office of Military Personnel Policy's Military Policy Development Division, CG-1331, which develops a recommended response. Multiple individuals within each office participate in the review. The request is then forwarded to the final approval authority, the Office of Military Personnel Policy, CG-133 (or designated alternate). The final decision on the request is made by the Chief, CG-133, a senior Coast Guard officer serving in the rank of Captain (O-6), or by his or her designated alternate, and includes a legal sufficiency review by the Office of General Law, CG-LGL. The decision is based on CG-133's review of the request package in light of the Religious Freedom Restoration Act of

1993 and applicable Coast Guard policy. The decision maker considers the sincerity of the member's religious beliefs, the extent to which the vaccine requirement burdens that belief, the government's compelling interest in mission accomplishment, and whether requiring vaccination against COVID-19 is the least restrictive means of achieving this compelling interest. Ultimately, CG-133's decision is memorialized in a memo explaining the decision. A copy is provided to the requester.

35. By policy, a member whose request is denied may administratively appeal a denial to the Director of Military Personnel (CG-13). All COVID-19 religious accommodation request appeals are currently adjudicated by myself, the Deputy for Personnel Readiness.[7] The appellate authority reviews the CG-133's denial for error, and in doing so considers the requester's appeal memorandum, the denial decision memo, endorsement, the request package reviewed by CG-133, and the executive summary prepared by legal.

36. The approval authority must review and make a decision on the accommodation request within 30 business days of the date the service member submitted an accommodation request. The Deputy for Personnel Readiness must reach a final decision on the appeal within 30 business days from the date the service member provided notice of an intent to appeal. If there a large influx of religious accommodation requests—like the historically large influx of requests related to the COVID-19 vaccination—then these timelines may not be met.

37. Service members with pending active requests for medical and religious exemptions, including appeals, are temporarily deferred from immunizations, pending outcome of their request. That means that they are not required to vaccinate unless and until they are ordered to do so following a denial of a request or appeal. The Coast Guard will take no disciplinary or

---

[7] Previously, all COVID-19 religious accommodation request appeals were adjudicated by either a designated Coast Guard rear admiral or designated members of the Senior Executive Service.

13

administrative action against any Coast Guard member based on their unvaccinated status while the member has a pending medical exemption or religious accommodation request. Unvaccinated members, however, remain subject to disciplinary action or separation from military service for other reasons unrelated to vaccination, *e.g.*, failure to meet weight standards or a failure to go to the member's place of duty. They may also still be subject to additional measures necessary to mitigate health risks to other members and the public. These measures may include additional restrictions on official travel, liberty (i.e. off-duty hours), and leave, as well as cancellation of "A" and "C" school orders.

### *III. Processes after Denial of an Exemption Request*

38. Members whose requests are denied are counseled by their command concerning the timeline to initiate vaccination. Upon notification of the final request denial, the standard timeline to initiate vaccination is within 10 business days of notification.

39. If an unvaccinated member's request for medical exemption and/or administrative exemption, including religious accommodation, is denied and the member still refuses to be vaccinated, the member would then be subject to possible disciplinary action or administrative separation from the Coast Guard. Before either action could take place, the Coast Guard would have to engage in specific processes set forth in either the Military Separations Manual, COMDTINST M1000.4, or the Military Justice Manual, COMDTINST M5810.1G, and the Uniform Code of Military Justice.

40. On July 22, 2022, the Coast Guard issued supplemental guidance initiating involuntary administrative separation processing for all non-compliant Active Duty service members and processing for involuntary transfer to the Inactive Status List (ISL) for all non-compliant Reserve service members. ALCOAST 270/22. The effective date of any individual member's separation

may be influenced by the needs of the Service—including, but not limited to: rate, officer specialty, and command concerns. However, non-compliant members who elect to receive an approved COVID-19 vaccine prior to their effective separation date will be removed from the involuntary separation process and restored to their prior active duty or reserve status. The characterization of discharge for any members separated for non-compliance with the vaccine mandate will be no less than General under Honorable Conditions.

41. The process required to administratively separate a Coast Guard member varies depending on a number of factors, such as the basis for separation, length of service, whether the member is a commissioned officer, chief warrant officer, or enlisted member, and type of commission. The various processes are detailed in the Coast Guard's Military Separation Manual, COMDTINST M1000.4.[8]

42. For example, a commissioned Regular Coast Guard officer with greater than five years of commissioned service,[9] who is not granted a waiver based on a medical or religious exemption request, and remains non-compliant with vaccination requirements, could be considered for separation from service in accordance with COMDTINST M1000.4, 1.A.14, and the statutory requirements of 14 U.S.C. §§ 2158 – 2164. These requirements include a review of their personnel record by the Personnel Service Center (PSC) and the convening of a determination board, which could either require the officer to show cause for retention in the Coast Guard or close the case. If the determination board decides to require the officer to show cause for retention, a board of inquiry is convened to afford a fair, impartial hearing at which the officer and their counsel have

---

[8] COMDTINST M1000.4, 1.A.14, outlines the process for separating regular Coast Guard Officers for Cause. Section 1.A.10 outlines the process for revoking a regular officer's commission in the first five years of service for cause. Section 1.B outlines the process for separating enlisted members.

[9] If the member has less than five years of commissioned service, she could be considered for separation from service in accordance with COMDTINST M1000.4, 1.A.10; and the statutory requirement of 14 U.S.C § 2159.

15

an opportunity to show that retention is warranted. The officer would be afforded the opportunity to be represented at the board of inquiry at no cost by a Coast Guard attorney, or to obtain private civilian counsel. After hearing the evidence, including any the officer might wish to present, the board of inquiry makes findings and recommends whether the officer should be retained or separated from the Coast Guard. If the board of inquiry recommends separation, the Commander of PSC convenes a board of review to review the record and documented evidence and determine whether to retain or separate the officer. If any of the three boards—the determination board, the board of inquiry, or the board of review—determines that the officer should be retained, then at that point the officer is retained and the case is closed. If the board of review recommends separating the officer, the board of review's recommendation is forwarded to the Commandant for review. The Commandant may disapprove a recommendation to discharge an officer, but may not overrule a determination to retain the officer. If the Commandant approves the boards' recommendation to discharge the officer and the officer is entitled to voluntary retirement under any provision of law, the officer is retired in the grade they would be retired as if they had requested voluntary retirement. If the officer is not entitled to retirement under any provision of law, they are honorably discharged with separation benefits under 14 U.S.C. § 2146(c) unless, under regulations promulgated by the Secretary, the condition under which the officer is discharged does not warrant an honorable discharge.[10] While the time for completing this process varies, generally this process takes at least six to nine months to complete, and can take over a year due to resolving scheduling conflicts, acting on requests for extensions of time to prepare, making transcriptions of

---

[10] Officers in the process of going through involuntary board action may, in accordance with article 1.A.21 of COMDTINST M1000.4, request to separate in lieu of completing the board process. If this is permitted, the officer will receive the same category of Separation Program Designator code on their Certificate of Release or Discharge from Active Duty, DD Form 214, that they would if the board process went to completion with a decision to separate.

16

proceedings, and other administrative concerns.

43. An unvaccinated member whose request for medical exemption or religious accommodation is denied and who refuses a lawful order to get vaccinated is also subject to discipline pursuant to the Uniform Code of Military Justice for violating Article 92, 10 U.S.C. § 892. The punishment for violating Article 92 could include dismissal from the Coast Guard, which can only be awarded at a general court-martial. R.C.M. 1003(b)(8)(A). At this time, however, no Coast Guard members have faced or are facing disciplinary action solely for a failure to obey a lawful order to get vaccinated.[11]

44. Coast Guard policy provides Coast Guard members with the opportunity to seek medical exemptions or religious accommodations to the COVID-19 vaccination requirement. While such requests are pending, the Coast Guard will take no adverse administrative or disciplinary actions against members. For Coast Guard members who choose not to pursue an exemption, or have their requests denied, and still refuse to be vaccinated, the Coast Guard is initiating involuntary separation processing. Each Coast Guard member subject to involuntary separation will receive all processes required to administratively separate them based on their particular circumstances, including their length of service, whether they are a commissioned officer, chief warrant officer, or enlisted member.

---

[11] Prior to charges being referred to a general court-martial for trial, a preliminary hearing is conducted. At that hearing, the member may be represented by a detailed military attorney at no cost and may present evidence and cross-examine witnesses. R.C.M. 405. After the preliminary hearing, charges can be referred to a general court-martial, but only by one of a limited number of Coast Guard admirals who are general court-martial convening authorities. 10 U.S.C. § 822. At the general court-martial, the member would again have the right to be represented by their detailed military attorney, to present evidence, and to cross examine witnesses. This entire process from referral of charges to court-martial generally takes several months, or more, to complete.

I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Dated: August 29, 2022

JONES.ERIC.C.1177712120
Digitally signed by JONES.ERIC.C.1177712120
Date: 2022.08.29 13:26:43 -04'00'

Eric C. Jones
Rear Admiral, U.S. Coast Guard
Deputy for Personnel Readiness